THE PHILLIP MINCH.

(Circuit Court of Appeals, Sixth Circuit. February 17, 1904.)

No. 1,228.

1. COLLISION—STEAMER AND PASSING TOW.

As a steamer with two barges in tow, each on a line about 500 feet long, was passing up the Detroit river in the daytime, about 800 feet from the Canadian side, and when she was about opposite a dock on that side, the steamer Minch, which had been coaling there, swung out and started slowly across the river, her head diagonally upstream. She continued to move slowly until she struck the rear barge about amidships. When she was some 200 feet ahead of the barge, and 50 to 75 feet on her starboard side, the helm of the barge was starboarded 1 or 1½ points; and immediately before the collision, and when it was inevitable, the helm was put hard aport to lessen the blow. *Held*, that the collision was due to the gross fault of the Minch, and that the barge could not be charged with contributory fault because she did not put her helm hard astarboard, since she had the right to expect the steamer to keep off to a safe distance, and for the further reason that there was a vessel with a tow passing down on the other side, and there was danger that the current might take her into them.

2. SAME—CONTRIBUTORY FAULT—BURDEN AND MEASURE OF PROOF.

It is not enough, when the negligence of one vessel is great, to condemn the other to a division of damages, that the question is a close one as to

whether she might not have done something she did not do to avoid the consequences of the other's negligence; but the evidence that the situation required her to do more than she did must be clear and convincing, since all questions of doubt are to be resolved in her favor.

Appeal from the District Court of the United States for the Northern District of Ohio.

This is a case of marine collision. The accident occurred in the Detroit river, near a coal dock, on the Canadian side, at Sandwich, in the afternoon of a fine day in April, 1896. The steamer Thompson was bound up the river, having in tow two iron whaleback barges, known, respectively, as the "134" and the "104," both coal laden. The 134 was the first in the tow. The towlines were of the usual length, of about 500 feet each. When about one-half mile below the coal dock, passing signals of one blast were exchanged with the steamer George T. Hope, bound down, having in tow the schooner Fitzpatrick. When these signals were exchanged, the Hope was about as far above the Sandwich coal dock as the Thompson was below. At this time the steamer Phillip Minch was lying at the Gadfield coal dock, head upstream. The Minch, being bound down, had stopped at the dock to coal. As the Thompson, which was proceeding up, at about 800 feet out from the coal dock with her tow following well in her wake, was passing the dock, the Minch was noticed to be swinging out, her bow pointing somewhat diagonally across the river. The river at this point is about 2,000 feet wide. The movements of the Minch from this moment were closely watched by the passing tow. Both in fact and appearance, she maintained some headway up to the moment of the collision with the 104, which must have occurred within about three minutes from the time the Thompson came abreast of the coal dock. Her heading continued to be nearly across the stream. Her bow had a constant tendency to swing downstream with the current, which was about 2 or 2½ miles per hour. But her headway was enough to hold her against this current, and to slowly make headway out into the stream. So slight was this headway out into the stream, that, when the barge 134 came up abreast of her, the Minch was still abreast of the middle of the coal dock, and about midway of the distance between the 134 and the dock. When the 134 had passed, and the Minch was heading about midway the towline between the two barges, the wheel of the 104 was starboarded a point. But the slow movement of the Minch did not stop, and, when the 104 came abreast, she was not more than 20 feet off her starboard side. A collision was then inevitable, and, for the purpose of lightening the blow, the helm of the 104 was put hard aport, with the intent to swing her stern to port, and thus convert the impact into a glancing blow. The collision which resulted was apparently a light one, and nothing more than a dent in the light iron of her sides was evident. Later it was discovered that her plates below the water line had been sprung so that she took water.

Harvey D. Goulder, for appellants.

Hermon A. Kelley, for appellee.

Before LURTON, SEVERENS, and RICHARDS, Circuit Judges.

LURTON, Circuit Judge, after making the foregoing statement of the case, delivered the opinion of the court.

1. The negligence of the Minch may well be regarded as gross and inexcusable. It is said for the Minch that, when she cast her head line off, the Thompson and her tow were nearly a half mile below, and the Hope and her tow an equal distance above, and that her purpose was to move up the river along the Canadian bank, and make her turn behind the Hope and her tow; that, after she had moved up alongside the dock a length, or nearly so, it was discovered that her steering gear would not work; that she was then stopped, and her steering engine found not to be connected with the steam. This

was remedied in a moment, and her movement up the river continued. It was plainly negligent to resume her voyage with her steam steering gear disconnected. This negligence was, however, remote, for her steering gear was properly connected by the time the Thompson came abreast, at which moment she seems to have resumed her movement by swinging her head away from the dock and heading across the stream. Before there was any apparent danger of collision the Minch was fully under control, and her conduct in continuing to run out into the river, with two tows passing, so far as to encroach upon the water which should have been left for them, is most unexplainable. The claim that she did not get her stern more than from 20 to 50 feet from the coal dock, and that the Thompson crowded in upon her without necessity, is not established. There is in this case the usual conflict between the evidence of the witnesses from the several crews as to the position of the Minch at the time of the collision, with reference to the dock. But we have no doubt at all but that the 104 was not less than 600, and probably 800, feet out from the dock at the time of the collision. This being so, the stern of the Minch was not less than 300 feet out from her dock, for her length was only about 275 feet. There was therefore abundant room for the Minch between the dock and passing tow to have waited for the tow to pass, or to back away when she found she was crowding over so far as to arouse even a suspicion of danger. It is said that she did back, and was backing when the collision occurred. But there was no occasion for going so near the path of the tow, and she began her efforts to retrieve her fault too late, for it is certain that she had not lost all of her headway when she struck the 104, for she ran into the barge about amidships, and gave, instead of receiving, the blow. We cannot escape the conclusion that the master of the Minch was either ignorant of the fact that he was encroaching upon the passing tow, or was indifferent to his duties under the circumstances. About her condemnation we have no doubt.

2. But it is said that the 104 did not do all that she could to avoid the collision, and should be condemned as contributing. This is an appeal to rule 28, which makes a vessel responsible for the failure to observe any precaution required by "the special circumstances of the case." To convict the barge of negligence, it is urged that the 104 did not starboard enough when she did starboard, and that, if she had put her helm hard over, instead of a point or point and a half, as she undoubtedly did do, the Minch would have cleared. But did "the special circumstances of the case," as they appeared, require any greater starboarding? When she starboarded, the Minch was about 200 feet above the bow of the barge, and some 50 or 75 feet on her starboard side—a position which, if maintained by the Minch, would have cleared without any starboarding at all. At that moment the Minch was apparently under full control, and she had in no way indicated that she was unmanageable. In fact, she was entirely manageable, and, if she had been then backed strong, would have undoubtedly cleared. About that time engine signals for backing were probably given. But as it turned out, they were ineffective

to stop her headway until too late. These engine signals were evidently given immediately before the collision. As the headway of the Minch continued, the helm of the barge was put hard aport as she came abreast of the barge in an effort to swing her stern away from the Minch and lighten the blow. But this was a movement in extremis. A collision was then inevitable. If the barge is to be condemned at all, it is because she did not put her helm hard astarboard, instead of only about half or two-thirds over. But there were two things to be considered before starboarding so far. There was the descending tow on her port side. The Hope had passed. Her tow, the schooner Fitzpatrick, was nearly abreast on her port side. Her master assisted his wheelsman in starboarding. Referring to the tow on his port side, he says:

"They had not passed us. That is one reason I took the wheel, being a dangerous place—helping the man at the wheel so she would not get the start of him and go over too far, so as to be in danger of the Hope and the Fitzpatrick."

There was also the possibility of a wide sheer to port if the current, against which the barge was contending, should catch her strongly on her starboard bow.

It is true that the master of the barge says that neither of these considerations controlled the question of his actual starboarding, and that he starboarded only a point or a point and a half because he did not think the situation required any greater starboarding in order to give the Minch room for clearing him. But whether he failed to put his helm hard astarboard because of the proximity of the descending tow or not, the fact that that tow was not more than 100 feet off his port side cannot be ignored. If it would have been imprudent to starboard more under the circumstances, then he is not to be condemned for starboarding only so far as he might prudently do, having regard to the dangers incident to such a course. There was no reason why the Minch should not be backed in order to avoid crowding or colliding with the tow. Every consideration of self-preservation, as well as duty to the passing tow, required that she should stop her headway in time to avoid collision. Every movement of the Minch from the time she left the coal dock justified the presumption that she was lying in the river, waiting for the tow to pass. So slight was her headway then that many of the witnesses describe her as having no headway, and as "sagging" or "drifting," and others say she was "lying still." Among the latter are some of the witnesses from her own crew. It is clear, however, that she did have some headway, and was still slowly moving out toward the tow, and had not lost all the headway when she hit the barge.

The master of the 104, Capt. Leonard, impresses us as giving a fair account of the situation immediately preceding the collision in the following questions and answers:

"Q. Could you form any estimate as to about how far the 134 passed from the bow of the Minch? A. Well, I should say between 100 and 150 feet. Q. Up to that time you may state whether the Minch had been moving otherwise than by simply swinging down stream. If so, how? A. Yes, sir; she was forging ahead all the time. Q. Did you notice her wheel—whether it had been in motion at all before that? A. No, sir; not in particular. Q. At this

time you say she had been forging ahead, had she had her stern moved out from the dock? A. Yes, sir. Q. At the time 'the 134 passed her, how far would you say her stern had moved out from the dock? A. Well, it would be fully as far—150 feet from the dock—as it was from 134. I suppose she was about midway from the dock and 134. Q. And still forging ahead? A. Yes, sir. Q.' Diagonally up the river all the time? A. Yes, sir; and swinging a little down all the time. Q. Now, as 134 went by the Minch, and the Minch's bow got abreast of the towline between you and the 134, what did the Minch do? Did she continue to do anything? A. No, sir; not that I noticed, just only lying still, and we forging ahead all the time—I suppose, waiting until we passed by, so as to give her a chance to turn. Q. At the time, after she had got past the stern of the 134, did you anticipate any danger from her? A. No, sir. Q. And why? A. Well, I suppose that at a certain time when he thought it was necessary he would certainly back up his boat to avoid collision. Q. Was there anything, so far as you could see, to prevent his backing up his boat—anything in the river? A. No, sir. Q. And after the 134 had passed the bow of the Minch, and the bow of the Minch was along down abreast of the towline, what, if anything, did you do then? A. I thought he was waiting for us to pass, and I started at my wheel in order to give him all the room that I could. Q. Were you at the wheel at the time of that maneuver? A. Yes, sir. Q. You helped turn the wheel yourself? A. Yes, sir. Q. Did your boat's bow sway to port in obedience to that? A. Yes, sir. Q. How far to port? A. We had the 134 all the way from a point to a point and a half on our starboard bow. Q. At this time do you remember whereabouts the Hope and Fitzpatrick were? A. They hadn't passed by us. That is one reason I took the wheel, being a dangerous place, helping the man at the wheel so she wouldn't get the start of him and go over too far, so as to be in danger of the Hope and Fitzpatrick. Q. Supposing we say that you had put your wheel hard astarboard, did you anticipate that there might have been danger of your going over and getting mixed up? A. Well, I don't think that I could put my wheel hard astarboard, for I would have went into it. I had to give the Minch all the room I thought it was perfectly safe to do. Q. At the time you put your helm hard astarboard, did you then anticipate any danger of collision with the Minch? A. No, sir. Q. And why? A. I supposed when he saw it he would back his boat up, to avoid collision. Q. Where was the Minch when you first anticipated that he wasn't going to back up? A. She was right close onto us—within fifteen or twenty feet of us. Q. When you first realized or anticipated that there was danger of collision, what did you do? A. When I saw there was no way of avoiding collision—when he was pretty near amidships—I put my wheel hard aport, so as to swing her stern to port, to make the blow as light as I could. Q. At the time you put your helm hard aport, how was your boat heading, with reference to the 134 ahead of it? A. When I put my wheel to port she was heading still to port of 134. Q. About how much? A. A point to a point and a half. When I got her off as far as I could, I held her until I saw there was no possible way except for the Minch to come into us, and then I shifted my wheel. She was lying perfectly still until I shifted my wheel. Q. What would be the effect, then, upon your vessel's stern, of throwing your wheel hard aport when she was in that position? A. It would throw her stern to port. Q. Away from the Minch? A. Yes, sir. Q. Where did the Minch's bow strike your boat? A. About amidships. Q. You were at that time, I understand you, on the wheelhouse, after it occurred? A. Yes, sir; I was at the wheel. Q. State, to the best of your judgment, what the distance of the stern of the Minch was from the Gadfield coal dock at the time her bow struck the 104? A. I would say 500 feet. Q. You may state whether up to that time there was anything in the river, or anything apparent on board the Minch, or anywhere in that vicinity, which would indicate to you that there was any reason why the Minch could not back? A. No, sir. Q. I will ask you whether the Minch gave any danger signals, or any signals to indicate that she was disabled or could not back? A. No, sir. Q. And was there anything between her stern and the dock that you know of? A. No, sir."

The situation was one which was brought about by the gross negligence of the Minch. In such circumstances, it is not enough for

her to cast doubt upon the management of the barge. The burden is upon her to establish by clear and convincing evidence that the situation as the barge should have judged it was one which required her to at once put her helm hard over, instead of half over, as she did. The Ohio, 91 Fed. 547, 33 C. C. A. 667, 672; The City of New York, 147 U. S. 73, 84, 13 Sup. Ct. 211, 37 L. Ed. 84; The Oregon, 158 U. S. 187, 197, 15 Sup. Ct. 804, 39 L. Ed. 943; The Victory, 168 U. S. 410, 423, 18 Sup. Ct. 149, 155, 42 L. Ed. 519; The Umbria, 166 U. S. 404, 409, 17 Sup. Ct. 610, 612, 41 L. Ed. 1053. In the case of The Victory, cited above, the court said:

"As between these vessels, the fault of the Victory being obvious and inexcusable, the evidence to establish fault on the part of the Plymouthean must be clear and convincing in order to make a case of apportionment."

In The Umbria, cited above, Justice Brown said:

"Indeed, so gross was the fault of the Umbria in this connection that he should unhesitatingly apply the rule laid down in The City of New York, 147 U. S. 72, 85 [13 Sup. Ct. 211, 37 L. Ed. 84], and The Ludwig Holbert, 157 U. S. 60, 71 [15 Sup. Ct. 477, 39 L. Ed. 620], that any doubts regarding the management of the other vessel, or the contribution of her faults, if any, to the collision, should be resolved in her favor."

The circumstances were not such as to justify an apportionment of damages simply because the master of the barge judged that the Minch would take timely measures to avert a collision. The negligence of the master of the Minch in not observing his own unreasonable encroachment upon her course, or in not taking timely measures to stop his headway out into the river, is a sufficient explanation of the collision which ensued. The Servia, 149 U. S. 144, 153, 13 Sup. Ct. 817, 37 L. Ed. 681; The Ulster, 1 Mar. L. C. 234. Whether the barge might not, with safety, have starboarded more than she did, and whether, if she had put her helm hard to starboard, the collision would have been avoided, may be close questions. Indeed, we may concede that the question is a debatable one, whether, under all the circumstances, she may not be regarded as in fault for not putting her helm hard astarboard, instead of halfway over. But it is not enough in any given case to say that the sequel shows that, if a particular thing had been done by the innocent vessel, the collision would have been avoided. "The question in all such cases is whether, in the exercise of due care and caution in the management of her at the time in any given case, such direction should have been given." Williamson v. Barrett, 13 How. 100, 108, 14 L. Ed. 68. Neither is it enough, when the negligence of the one vessel is great, to condemn the other to a division of damages, that the question is a close one as to whether she might not have done something she did not do to avoid the consequences of the other's negligence. The evidence that the situation was one which required her to do more than she did must be clear and convincing, for all questions of doubt should be settled in her favor. We do not think the evidence establishes a case which was so plain as to make it culpable negligence for the barge to presume that the Minch would not be guilty of the astonishing fault of deliberately running into the ascending tow, and that she should be condemned for presuming, under the

facts we have stated, that the Minch would stop her heading toward the 104 by either backing, or by a radical change in her steering, in time to avoid collision. If the circumstances had indicated that the Minch was disabled or had not seen the tow, a different case would be presented.

The decree of the district court condemning the Minch and denying a division of damages is affirmed.