## THE TARPON.

(District Court, S. D. Alabama. August 27, 1904.)

No. 1,050.

1. COLLISION—STEAMER AND SCOW ADRIFT AT NIGHT—BURDEN OF PROOF.

A scow which was cast loose by a dredge after being loaded in the evening, and drifted with the wind and tide across the channel, also carrying her light at the stern, where it was likely to be mistaken for a range light, or to mislead another vessel as to her position, has the burden of establishing by clear evidence that a steamer which came into collision with her was in fault.

2. SAME—EVIDENCE CONSIDERED.

Evidence considered, and *held* insufficient to establish the fault of a steamer for a collision with a scow drifting in a channel at night, either because she did not keep on the outside of the dredged channel, there having been no apparent necessity for so doing, or for the failure to have a lookout, it not appearing that the presence of one would have availed to prevent the collision, and those having charge of the scow being clearly negligent in allowing it to drift across the channel without necessity therefor.

In Admiralty. Suit for collision.

R. H. & N. R. Clarke, for libelant.

Stevens & Lyons and John C. Avery, for claimant.

TOULMIN, District Judge. 1. The libelant, the National Dredging Company, owners of a scow with which the steamer Tarpon collided in coming up the channel of Mobile Bay, charges that the steamer was at fault in that she failed to keep to the side of the main channel on her starboard side, as required by the statute and the pilot rules of all steam vessels in narrow channels.

2. It charges that the steamer failed to keep a proper lookout. The rules provide that in narrow channels every steam vessel shall, when it is safe and practicable, keep to that side of the fairway or mid-channel which lies on the starboard side of such vessel. Pilot Rules, p. 17, art. 25. It will be observed that this rule applies only when it is "safe and practicable," and it only requires the vessel to keep to that side of the fairway or mid-channel which lies on the starboard side of such vessel. Hughes, Adm. § 136, p. 252. The evidence is that there were range lights placed by the libelant, "running north and south, up or near the middle of the channel." The libelant's dredge, with which the scow was used, was on the western side of the channel, and was on the line of the range stakes, to which the lights were affixed. The scow was on the west side of the dredge during the process of loading, and when loaded with mud it was cast adrift, awaiting the coming of a tug to tow it to the dumping ground. When loaded the combing of the scow stood about two and one-half feet above the water. At the time it was cast adrift the tide was running out a little to the eastward, and the wind was blowing from the northwest about six or seven miles an hour, which turned the scow diagonally to the eastward. The captain of the dredge did not see the steamer Tarpon at the time the scow was shoved out. It had drifted from the dredge, supposedly about 50 feet, before the captain of the dredge saw the

steamer. She was coming up the channel, and blew her usual signal when 500 or 600 feet away. The dredge answered, which her captain says meant "slacken the lines to let the steamer pass over." The scow was then about 200 feet ahead of the dredge, diagonally across the channel, heading to the southeastward, and near the center of the channel. It drifted with the wind and tide. The steamer was coming up the main channel to pass to the eastward of the dredge, and kept eastward of the range lights, the usual course. One end of the scow was near the upper end of the range lights, and was on a line with the post side of the dredge, which headed south down the channel. The dredge was 37 feet wide and about 80 feet from the west bank of the channel. The scow was at least 120 feet long, and the channel from its east side to the dredge was 172 feet. The collision was with the corner of the south or east end of the scow, which was the opposite end to where its light was. The captain of the dredge says he gave the signal to the steamer to come on, because the channel was not all the way blockaded, and he thought there was room for her to pass.

From the undisputed evidence as to the location of the range lights in or near the middle of the channel, and of the position of the dredge and of the scow, it seems to me clear that the steamer was keeping to that side of the mid-channel which was on her starboard side. It does not appear from the evidence how much of the 172 feet of the channel from its east side to the dredge was actually occupied by the scow; but the fact that the scow was at least 120 feet long, and was drifting diagonally across the channel, and was struck only on the corner by the steamer, is very persuasive to show that the latter was well to the eastward of the mid-channel. However, this is hardly disputed by the libelant, but it is contended that the steamer should have gone outside of the channel, and thus have avoided a collision. This is true if the steamer had reason to believe there was risk of collision with the scow in the channel, and if it was "safe and practicable" for her to have gone further to the eastward, even outside of the channel; that is, if the water there was available for her navigation, as to which the evidence is not very clear. But if the steamer had no reason to apprehend a collision with the scow, no duty devolved on her to go outside of the channel, whether or not it was "safe and practicable" for her to have done so.

The charge that the steamer did not have a proper lookout I think is supported by the evidence. The Genesee Chief, 12 How. 462, 13 L. Ed. 1058; The Ottawa, 3 Wall. 268, 18 L. Ed. 165. Great caution and vigilance rests on those engaged in the navigation of vessels propelled by steam, and it was the duty of the steamer Tarpon to have seen the scow as soon as it could be seen by the exercise of proper caution and vigilance, and to so govern herself as to guard against peril to either vessel. If seen, and it were possible, by the exercise of due care and skill, to have kept out of the way of the scow, helplessly driven here and there by the tide and wind to which it was subjected, it was the duty of the steamer to have kept out of the way. Evidence for the defense is that the pilot of the steamer kept a vigilant lookout, and exercised caution in ascending the channel, running his vessel at very slow speed, being from two to three miles an hour.

He saw no obstruction in the way until he discovered the scow in the channel some 35 or 40 feet ahead of his vessel. He then attempted to avoid a collision by stopping his engine and putting his wheel to port, in the endeavor to pass eastward of the scow, but the steamer was too close to the scow when he saw it for him to clear it, and he struck it on the corner, as already shown. The steamer had been passing up and down the channel on regular and frequent trips for the preceding 12 or 14 months, and had not before encountered or seen a scow adrift in the channel, and it appears had no reason to expect it there on this occasion, or to apprehend collision with it until within 35 or 40 feet of it, when the pilot testifies it was too late to avoid the collision. The evidence further is that the libelant's tug was about 200 yards on the port side of the steamer Tarpon, and almost at right angles to the channel, and so used its searchlight as to blind the pilot of the steamer, or so obstruct his vision as to prevent his seeing the scow; that said searchlight was played across and in front of the steamer up and down the channel, and so effectually obscured the scow as rendered it impossible to be seen by those navigating the steamer. There is expert testimony, by disinterested witnesses in the case, that playing a searchlight, as the evidence shows was done in this instance, would have the effect testified to by the pilot and captain of the steamer as above stated. There is some evidence to the contrary on the part of the libelant, but the preponderance of the evidence on the point is I think decidedly with the steamer. While the steamer Tarpon did not have a proper lookout, I am not satisfied that the absence of such lookout caused the collision, or that the presence of one would have availed to prevent it. The Nettie Quill (D. C.) 124 Fed. 667, and authorities therein cited. The scow was some 200 to 400 feet from the dredge, in an unusual place, and adrift, with a light on it identical with the range lights, except that it was perhaps a few feet higher from the water, from which it was probably not distinguishable or specially noticeable under the conditions then and there existing; indeed it is said to have been obscured by the stronger and brighter searchlight on the tug. Moreover, while the scow had a proper light, it was not carried in the proper place, as required by the rules, It should have been carried forward. The evidence shows it was aft, on the end of the scow opposite to that collided with, and all of 100 feet therefrom. If the pilot of the steamer had seen the light, and had distinguished it from the range lights, he would have been reasonably misled by it; having the right to assume that the light was carried in the proper place forward. There is no presumption in favor of the scow, which was unnecessarily set adrift where and when it was liable to be, and was, carried by the wind and tide into, and obstructed, the channel. Ross v. Merchants' & Miners' Transp. Co., 104 Fed. 302, 43 C. C. A. 538.

My opinion is that the collision was due to the fault of libelant's servants and employés in sending the scow adrift on an outgoing tide, with a northwest wind blowing at the rate of six or seven miles an hour, admittedly knowing the effect of which was to carry the scow into and across the channel, and unnecessarily obstructing it; to their failing to give the danger signal or other notice to the steamer when she was seen coming up the channel from 400 to 700 feet away, as differ-

ently estimated, knowing that the scow was adrift in the channel, and only 50 to 100 feet from the dredge at the time the captain of the dredge says he saw the steamer approaching; and to the error of judgment in the manner in which the searchlight was used. I think these faults are established by uncontradicted testimony, and are, of themselves, sufficient to account for the collision. The situation was brought about by the negligence of libelant's servants and agents. In such circumstances, it is not enough for it to cast doubt upon the management of the steamer, "but the evidence that the situation required her to do more than she did must be clear and convincing, since all questions of doubt are to be resolved in her favor." The Philip Minch (C. C. A.) 128 Fed. 578. "Where the fault of one vessel is palpable and adequate to account for a collision, she cannot impugn the management of another vessel, except on clear proof of contributory fault." American S. S. Co. v. American Steel Barge Co. et al. (C. C. A.) 129 Fed. 65; The Ludvig v. Holberg, 157 U. S. 60, 15 Sup. Ct. 477, 39 L. Ed. 620; The City of New York, 147 U. S. 72, 13 Sup. Ct. 211, 37 L. Ed. 84; The Victory and Plymothian, 168 U. S. 410, 18 Sup. Ct. 149, 42 L. Ed. 519.

The mere happening of a collision does not give rise to a right of action for damages resulting therefrom, except in those cases where, under the navigation rules, one vessel is presumed to be in fault until she exonerates herself. Even in those cases the right of recovery is based, not upon the mere collision, but upon the presumption of negligence. Hughes, Admr. p. 269, § 144.

I do not find that any of the allegations of fault against the steamer are sustained. The libel is therefore dismissed.