## THE LUDVIG HOLBERG.[1]

**APPEAL FROM THE CIRCUIT COURT OF THE UNITED STATES FOR THE SOUTHERN DISTRICT OF NEW YORK.**

No. 136. Argued January 8, 1895. — Decided March 4, 1895.

A statement that a steamship, in the harbor of New York, with no fog, meeting a tug with a tow, starboards after receiving two whistles from the tug and subsequently ports and attempts to pass between the tug and her tow, is grossly improbable.

---

[1] The docket title of this case is "The F. O. Matthiessen & Wiechers Sugar Refining Company *v.* The Steamship Ludvig Holberg &c., Christopher Kahrs *et al.*, claimants."

## Statement of the Case.

A steamship, running in a fog at dead slow and coming in contact with a tug, cannot be held responsible simply because, a few minutes before the collision, she had been running full speed.

A steamer running in a fog is not obliged to stop at the first signal heard by her unless its proximity be such as to indicate immediate danger.

The remarks of the court in *The Colorado*, 91 U. S. 692, 698, held not to apply to this case.

The findings show that the tug was in fault in failing to send three blasts of whistle, in quick succession.

When, in a collision case, uncontradicted testimony establishes fault on the part of one vessel, the mere raising a doubt touching the conduct of the other will not overcome its effect.

For reasons stated in the opinion, the court regrets that the tug could not be brought into this case, and it affirms the decree of the court below.

THIS was a libel in admiralty for a collision which took place on May 27, 1887, in the lower bay of New York, between the barque Quickstep, then in tow of the tug Leonard Richards, and the Norwegian steamship Ludvig Holberg, outward bound and in ballast. The suit, which was promoted by the owner of the cargo of the barque, was originally begun against both the tug and the steamship, but no service appears to have been obtained upon the tug, as the steamship alone appeared and answered. The District Court dismissed the libel, and the libellant appealed to the Circuit Court, which affirmed the decree of the District Court and made the following findings of fact:

"(1) The libellant Stafford was the owner of the barque Quickstep before and at the time of her loss on the 24th of May, 1887. The libellant, the F. O. Matthiessen & Wiechers Sugar Refining Company, is a corporation and was the owner of a cargo of sugar laden on board said barque.

"(2) On the afternoon of the 24th day of May, 1887, the barque Quickstep, laden with a cargo of sugar, was being towed from sea into the port of New York by the tugboat Leonard Richards on a hawser eighty fathoms long. While proceeding up about in the middle of the main ship channel and when a little to the southward and eastward of buoy No. 11, at about 4.26 P.M., she was run into by the steamship Ludvig Holberg, the latter vessel striking the barque on her

port quarter about the mizzen-topmast backstay, cutting into her after companion door — a distance of about nine feet — cutting her open so that the cargo rolled out. Immediately after the collision said barque began to sink, and, while sinking, was towed by the tug on to the west bank, where she grounded in 25 feet of water about a quarter of a mile below buoy No. 11, and became a total loss, and her cargo was nearly all lost.

"(3) The barque was 170 feet long, 37 feet beam, 23 feet depth of hold, and was laden with 1024 tons of sugar, and drew 20 feet of water.

"(4) The Ludvig Holberg, which hails from Bergen, Norway, was an iron screw steamship of 687 tons register, 200 feet long. The claimants, Christopher Kahrs and others, were her owners. She was in ballast, drawing 13 feet aft and 9 feet forward, bound for Barracoa for fruit. She was tight, staunch, strong, and properly manned and officered, having a competent master and officers and a full complement of men. At and prior to the time of collision her master and pilot were on the bridge. She steers by hand, and there was at her wheel one ordinary seaman, steering the vessel as directed by the pilot. The first officer and second officer were on lookout on the port and starboard sides respectively of the forestay, which is fastened to the stem. Back of them, by the windlass, was the carpenter, also on lookout.

"(5) The steamship started from pier 15 East River some time between 3.05 and 3.15 P.M. She ran slow out of the East River, but soon increased to full speed, and continued to run at that rate until, fog having set in, she reduced to half speed, and later to dead slow. Her motion through the water was, while at full speed, about 9 to 9½ knots; while at half speed, about 6½ to 7 knots; while at dead slow, about 3½ knots an hour. She had been running at the latter rate for a few minutes only, probably not more than four or five, before the collision. The pitch of her screw was 14 feet 2 inches, and at full speed she made from 69 to 71 revolutions per minute; at half speed, from 40 to 45 to 50 revolutions per minute; and at slow speed from 20 to 25 to 26 revolutions per minute.

"(6) She was off Bedloe's Island between 3.27 and 3.32,

and it was nearly 4 o'clock when she reached Fort Lafayette. The distance from that point to the place of collision is a little over 3⅓ knots. She carried the ebb tide with her from Bedloe's Island to a little below the forts. After a brief period of slack water and until the collision there was a flood tide. Its set was about S. W., which helped a vessel coming in about one knot an hour, and a vessel going out about half a knot an hour. The wind was southerly, blowing a stiff breeze.

"(7). At the time and place of collision there was so much fog as to prevent vessels from being visible to each other for more than a short distance, (estimated by the witnesses from the Holberg at between 200 and 300 feet,) and such as to require the sounding of fog signals under the rules. Such signals were sounded by the Ludvig Holberg. This fog had prevailed between the Narrows and buoy No. 11 during a period of at least 15 minutes before the collision.

"(8) The Ludvig Holberg ran into this fog about the time she passed the forts, and at that time began sounding fog signals, but did not reduce her speed until she had run some distance below the forts. Then she reduced to half speed only, and did not further reduce her speed until about buoy No. 13.

"(9) By the time she reached a point a little below buoy No. 13 she had slowed down to about four knots over the ground. From that point to the place of collision, a distance of about 4500 feet, she did not increase her speed, proceeding down the channel, keeping upon the starboard side, as near the channel buoys as she could safely go, and sounding fog signals from time to time.

"(10) While she was thus proceeding she heard one blast right ahead, then another a little more on the starboard bow. Both these were blown by the tug, which was not at that time visible, through the fog, to those on board the Holberg.

"(11) Almost immediately thereafter the tug came in sight only a few hundred feet off and a little on the steamer's starboard bow, and gave a signal of two blasts.

"(12) Neither the barque nor the hawser were then visible, and no signals indicated to the Ludvig Holberg that the tug had a tow nearly 500 feet behind her.

"(13) Upon receiving the whistle of two signals from the tug, the steamer starboarded and passed the tug starboard to starboard, clearing her about 30 feet.

"(14) Then, for the first time, the Ludvig Holberg became aware of the presence of the Quickstep, which was not following directly after the tug, but to starboard of her, and whose pilot at that time, by putting her wheel hard-a-port, threw her head somewhat more to starboard.

"(15) Thereupon the steamship ported in order to go between the tug and the barque, at the same time hailing the tug to cast off the hawser.

"(16) If the hawser had been cast off promptly the steamer would probably have gone safely between the tug and the barque.

"(17) The hawser was not cast off, and the steamer running against it with her starboard bow parted it, and at the same time her bow was swung to port, resulting in collision with the barque's port quarter.

"(18) The steamer stopped and reversed as soon as she saw the tug had a vessel in tow, but not before, and was nearly stopped at the time of collision.

"(19) Had the steamer been aware when she starboarded to pass the tug that the latter vessel had the Quickstep in tow on a hawser of 80 fathoms, she could and in all probability would have avoided the collision.

## " *Conclusions of law.*

"(1) Said collision was not due to any fault or negligence of those in charge of the Ludvig Holberg.

"(2) The libels herein should be dismissed, as already decreed by the District Court, with costs to the claimants in both courts."

Claimants also put in evidence a duly certified copy of the following rule of the supervising inspectors:

"Rule X. Section 8. All steam vessels, (except upon the Red River of the North and rivers whose waters flow into the Gulf of Mexico,) when engaged in towing during fog or thick

weather, shall sound three distinct blasts of their steam whistles in quick succession, repeating at intervals not exceeding one minute."

From the decree of the Circuit Court libellant appealed to this court.

*Mr. George A. Black* for appellant.

*Mr. Harrington Putnam* for appellees.

MR. JUSTICE BROWN, after stating the case, delivered the opinion of the court.

This case turns almost altogether upon questions of fact, and particularly upon the existence and density of the fog at the time of, and immediately before, the collision. From the opinions both of the Circuit and District Courts it would appear that libellant took the ground in both courts that there was little or no fog prior to the collision, and no fog signals were given by the tug, while the steamship's witnesses claimed that the fog had set in from fifteen to thirty minutes before, and became so dense that neither the tug nor the barque could be seen over four hundred feet distant; and that the steamship was regularly sounding her steam whistle. If there were no fog, then the steamship was grossly and inexplicably in fault for starboarding, after receiving two whistles from the tug, and subsequently porting, and attempting to pass between the tug and her tow. Indeed, the very flagrancy of her fault in this particular was such as to lead to the belief that it is not likely to have been committed.

In this court, however, libellant takes the position that the steamship Holberg was in a dense fog from the time of passing the Narrows, at about four o'clock, up to the time of the collision, at 4.26; that the Quickstep was not, however, in this fog, and hence the witnesses on the steamer, looking from the fog into the clear weather, could see the tow farther than the witnesses on the tug, looking into the fog, could see the steamer. The difficulty with this assumption is that there is nothing in the facts to support it. The seventh finding is

that ."-at the time and place of collision there was so much fog as to prevent vessels from being visible to each other more than a short distance, (estimated by the witnesses from the Holberg at between 200 and 300 feet,) and such as to require the sounding of fog signals under the rules. Such signals were sounded by the Ludvig Holberg. This fog had prevailed between the Narrows and buoy No. 11 during a period of at least 15 minutes before the collision." Finding No. 10 is: " While she " (the steamship) " was thus proceeding she heard one blast right ahead, then another a little more on the starboard bow. Both these were blown by the tug, which was not at the time visible through the fog to those on board the Holberg." The opinion, too, of the District Judge is the direct converse of the respondent's argument in this particular, wherein he says " some further explanations of the discrepancies between the witnesses of the barque and of the Ludvig Holberg may be found in the fact, often testified to before me, that objects cannot be distinguished so easily or so far in looking toward the fog as in looking away from it. The barque's witnesses may, therefore, have been able to distinguish the steamer before the latter could distinguish the barque." There is a further finding, (No. 8,) that the Holberg " ran into this fog about the time she passed the forts," from which we infer, and such also is the testimony, that the fog was coming up the bay from the southward, whereas the theory of the libellant assumed that there was a bank of fog at and just below the Narrows, while the weather was comparatively clear where the Quickstep was.

The stress of the libellant's argument is that, considering the state of the weather, the steamer was not proceeding at the moderate rate of speed required by law in foggy weather, and did not take prompt measures by stopping and reversing to avoid a collision. The finding as to her general speed is (No. 5) that she " started from pier 15, East River, some time between 3.05 and 3.15 P.M. She ran slow out of East River, but soon increased to full speed, and continued to run at that rate until, fog having set in, she reduced to half speed, and later to dead slow. Her motion through the water was, while

at full speed, about 9 to 9½ knots; while at half speed, about 6½ to 7 knots; while at dead slow, about 3½ knots an hour. She had been running at the latter rate for a few minutes only, probably not more than four or five, before the collision." (6) "She was off Bedloe's Island between 3.27 and 3.32, and it was nearly four o'clock when she reached Fort Lafayette. The distance from that point to the place of collision is a little over 3½ knots." (8) "At that time" (as she passed the forts) "she began sounding fog signals, but did not reduce her speed until she had run some distance below the forts. Then she reduced to half speed only, and did not further reduce her speed until about buoy No. 13." (9) "By the time she reached a point a little below buoy No. 13, she had slowed down to about four knots over the ground. From that point to the place of collision, a distance of 4500 feet, she did not increase her speed."

We cannot say that these findings exhibit any fault on the part of the steamship in this particular. She was clearly not bound to stop solely on account of the fog, and if she had been running dead slow for four or five minutes before the collision, she cannot be held in fault for what her previous speed may have been. If she ran twenty miles an hour down to the Narrows, and was running dead slow at the time she first heard the tug's whistle, fault could not be imputed to her for her previous speed.

These findings, however, are attacked upon the ground that the testimony showed that the steamship passed Fort Lafayette at 4.05; that the collision occurred at 4.26, three and one-eighth knots, or 19,000 feet below the fort, thus implying that she must have covered that distance at the rate of over nine knots an hour. However persuasive this argument may have been when addressed to the District or Circuit Court, it is entitled to but little weight here, since the finding is that "it was nearly four o'clock when she reached Fort Lafayette," and that four or five minutes before the collision she had been running dead slow. The finding of the District Judge was also that at the time Holberg was sounding her signals, she was going "dead slow" — not over three and a half knots.

There is no such manifest inconsistency between the findings of the Circuit Court in this particular as to require us to reject either of them. Both of them may be-true, and when it comes to fixing the time exactly to the minute, there is always a liability to error. The testimony of the officers and crew of the Holberg as to her speed is not only uniform, but is corroborated by that of the master of the steamboat St. Johns, which passed her abreast of buoy 13, while going herself at a speed not exceeding five miles an hour. It is sufficient to say in this connection that there is no such unanimity of testimony as to compel us to say that both courts were mistaken in finding that the steamer was proceeding dead slow at the time she heard the tug's whistle. There was some evidence to that effect, and that is sufficient to support the finding.

Did she act with sufficient promptness in stopping and reversing after she became aware of the proximity of the tug? The finding in that particular is, (10) " While she was thus proceeding she heard one blast right ahead ; then another a little more on the starboard bow — both these were blown by the tug, which was not at that time visible through the fog to those on board the Holberg." (11) " Almost immediately thereafter the tug came in sight only a few hundred feet off and a little on the steamer's starboard bow, and gave a signal of two blasts." (12) " Neither the barque nor the hawser were then visible, and no signals indicated to the Ludvig Holberg that the tug had a tow nearly 500 feet behind her."

No case has ever held that a steamer was obliged to stop at the first signal heard by her, unless its proximity be such as to indicate immediate danger. The next signal denoted that the tug was coming down on the starboard bow of the steamer, and as she came in sight almost immediately thereafter, only a few hundred feet off, and there was nothing to indicate the presence of a tow, the steamer was in no fault for proceeding, and as a matter of fact she passed the tug in safety. Had she been aware of the presence of the tow a wholly different question would have been presented. The fact that the tug was under a rank sheer to port, as claimed by the barque, does not affect this question. Indeed, there is

nothing in the findings to show it, and if it were so, it indicated safety rather than danger, as such course would take her away from that of the steamer.

It is found (18) that " the steamer stopped and reversed as soon as she saw the tug had a vessel in tow, but not before, and was nearly stopped at the time of the collision." This finding is also attacked upon the ground that it is inconsistent with the second finding, that the steamship cut into the barque a distance of nine feet, cutting her open so that the cargo rolled out. There is no finding, however, as to the speed of the Quickstep at the time of the collision, and if the steamer had come to a standstill, a speed of five miles an hour on the part of the barque would have had the same effect in crushing her sides that the same speed would have had if she had been at rest and the steamer in motion. It was also the opinion of the District Judge that the force of the blow was mainly owing to the forward motion of the barque. Though the collision was conclusive evidence of speed on the part of one vessel or the other, it was not conclusive evidence of speed on the part of the steamship.

While it was held by this court in *The Colorado*, (91 U. S. 692, 698,) that a steamer of 1470 tons ought to have more than one wheelsman in a fog, it was not laid down as a general rule applicable to all steamers, but was based upon the size of the propeller in that case, and upon the fact that when the emergency came, the mate deemed it necessary to order the lookout to leave the place where he was stationed, and go to the wheel to help the wheelsman put the wheel over, leaving the propeller for the time being without any lookout. It was said that " steamers of such size, under such circumstances, ought never, in a dark night, to be without a watch on deck sufficiently effective to change the course of the vessel with celerity without withdrawing the lookout from his station and appropriate duties." These remarks have no necessary application to a steamer of 687 tons, which is found by the Circuit Court to have been "properly manned and officered, having a competent master and officers and a full complement of men." There seems to have been no fault on

the part of the steamship by reason of any inability of the wheelsman to turn the wheel with sufficient promptness.

Upon the findings in this case there can be no doubt of the fault of the tug in failing to conform to the rule of the supervising inspectors requiring steam vessels, when engaged in towing during a fog, to sound three distinct blasts of their steam whistles in quick succession, at intervals not exceeding one minute. In fact, the tug appears to have sounded no fog signals at all. The fault in this particular was aggravated by the great length of the tug's line, and it is by no means certain that she was not guilty of a distinct fault in failing to shorten the line as she came up the bay. Had the steamship been apprised of the fact that the tug was encumbered by a tow, there is no doubt that by putting her wheel hard-a-starboard, she could have avoided the barque; but seeing the tug alone, she was under no obligation to take further precautions than such as were necessary to avoid her. Her action after she became aware of the fact that a tow was behind the tug was probably the most prudent that was left to her under the circumstances. Whether she should put her wheel hard-a-starboard, and endeavor to pass the barque to port, or should port, in order to pass between the vessels, was, in the imminence of the collision, largely a matter of discretion with her master, and she should not be condemned for the result. The steamship had been brought into a perilous position by the conduct of the tug, and ought not to be criticised for the efforts she made to extricate herself. Her porting, if an error at all, was one committed *in extremis.*

Fault is imputed to the barque for failure to cast off her line promptly, and also for conflicting orders given to the wheel, but we are not disposed to scan her actions in the excitement of the moment too closely, although the court finds : (16) That "if the hawser had been cast off promptly the steamer would have probably gone safely between the tug and the barque." We do not find it necessary to express an opinion in this particular.

This is one of those cases where a clear fault has been found on the part of one of the vessels both by the District

and Circuit Courts, and the findings of fact are such as to render it incumbent upon us to affirm their decree. As we said in *The City of New York*, 147 U. S. 72, 85 : " Where fault on the part of one vessel is established by uncontradicted testimony, and such fault is, of itself, sufficient to account for the disaster, it is not enough for such vessel to raise a doubt with regard to the management of the other vessel. There is some presumption at least adverse to its claim, and any reasonable doubt with regard to the propriety of the conduct of such other vessel should be resolved in its favor." The usual effort is made in this case to impeach the findings of the Circuit Court, but libellant at best has only succeeded in raising a doubt, which is not sufficient. If there be any evidence to support the findings, as there undoubtedly is, they should not be disturbed.

We are by no means insensible of the fact that a practical injustice may have been done to the owners of the Quickstep and her cargo in the litigation which is closed by this decision, by reason of the inability of the libellants to obtain service in this suit upon the tug. It appears that a suit was subsequently begun against the tug in the District of New Jersey. This suit resulted in a decree of the District Court condemning her for the want of a proper lookout, and for failing to stop immediately after her first signal. *Kiernan v. The Leonard Richards*, 38 Fed. Rep. 767. No opinion was expressed as to the fault of the steamship. On appeal to the Circuit Court this decree was reversed, and the steamship held to have been wholly in fault for not complying with the signals agreed upon, and changing her signals at an inopportune moment, the court construing the fog signals of the steamship as signals to the tug to port. It was said by the District Judge that the barque was conceded to have been free from fault. A like assumption was made by the Circuit Judge, who also stated that, if the people in charge of the Holberg had been brought in to testify, the case might have had a different look. In that suit the steamship was not represented by witnesses. To this suit the tug was not a party, and was not represented by counsel, though two of her crew appear to have been sworn

on behalf of the libellant. The result is that, in the suit in which the steamship was not represented, she was found wholly in fault, and in the suit in which the tug was not represented, she is found in fault. The litigation is an apt illustration of the maxim, *les absents ont toujours tort.*

We regret that the tug could not have been brought into the case; but the District and Circuit Courts were bound by such testimony as was introduced, and we are bound by the record and the findings of the Circuit Court. Adjudging, as we do upon these findings, that no fault can be imputed to the steamship, we have no choice but to affirm the decree.

The decree of the Circuit Court is, therefore,

*Affirmed.*