GILCHRIST TRANSP. CO. v. SICKEN et al.*

SICKEN et al. v. GILCHRIST TRANSP. CO.

'(Circuit Court of Appeals, Eighth Circuit.   July 16, 1906.)'

Nos. 2,366, 2,376.

1. TOWAGE—NEGLIGENCE OF TUG—LIABILITY.
   A steamer which engages to tow a vessel to a port undertakes to ex·
   ercise reasonable skill and care in everything relating to the work, in-
   cluding the entrance to the port, and the lack of either charges her
   with liability for the damage caused thereby.
   [Ed. Note.—For cases in point, see vol. 45, Cent. Dig. Towage,
   §§ 11–23.]

2. SAME.
   The entrance to the harbor at Duluth is through a canal 1,200 feet
   long and 300 feet wide, which extends in a general easterly and west-
   erly direction and is bounded by heavy cement piers on each side.
   It was negligence for a laden steamer which was towing a sailing
   vessel light up Lake Superior to Duluth upon a line 900 feet long
   when the steamer approached the canal from a southerly direction
   into a northwesterly wind of 35 to 40 miles an hour which blew
   nearly athwart the line of the canal, to fail to wait for a tug or to
   take some other reasonably safe course, and to attempt to draw the
   barge, whose lights were visible, and which was drifting far to the lee-
   ward, into the canal, whereby the barge was brought into collision
   with the outer end of the south pier and damaged.

3. SAME—CONTRIBUTORY NEGLIGENCE OF TOW.
   The master of a barge in tow of a steamer which has drawn it up
   from a southerly direction in a heavy northwest wind and then squared
   away to enter the Duluth ship canal, who first learns when he is moving at
   the rate of 10 miles an hour and is within 200 feet of the south pier,
   that his vessel will be drawn against it, is not guilty of contributory
   negligence because he fails to throw off or cut his tow line before
   his barge strikes the pier.

4. SAME—ACTS OF MASTER IN EXTREMIS.
   The acts and failures to act of a master of a vessel after it has
   been put in extremis by the negligence of another, do not ordinarily
   constitute contributory negligence even when erroneous.
   [Ed. Note.—For cases in point, see vol. 45, Cent. Dig. Towage, §§ 24–26.]

(Syllabus by the Court.)

Appeals from the District Court of the United States for the Dis-
trict of Minnesota.

Herbert R. Spencer, for M. Sicken and others.

John H. Norton and Albert J. Gilchrist, for the Gilchrist Transp. Co.

Before SANBORN, HOOK, and ADAMS, Circuit Judges.

SANBORN, Circuit Judge.   About 6 o'clock in a dark, stormy
evening in November, 1903, the steamer, John Harper, a vessel 290
feet in length by 40 feet beam, laden with coal, towed the barge,
Gawn, light, a sailing vessel 171 feet in length by 32 feet beam,
which the Harper was taking from Lake Michigan to the port of
Duluth, against the outer end of the south pier of the Duluth ship

*Rehearing denied November 16, 1906.

canal, whereby the owners of the Gawn sustained damages in the sum of $2,949.50. They libeled the Harper, and the court found that the master of each vessel was negligent and divided the damages. Both parties appealed.

The Duluth ship canal extends in a general easterly and westerly direction and is 1,200 feet long and 300 feet wide at its eastern end. It cuts near its base Minnesota Point, a narrow tongue of land which stretches several miles in a southeasterly direction and separates Lake Superior from the harbor of Duluth. Heavy cement piers bound the sides of the canal. On the outer end of the south pier there is a lighthouse and a fog signal and half way from the eastern to the western end of this pier is a range light. On the north pier are electric lights. The Harper came up Lake Superior from the vicinity of Devil's Island on the usual course, towing the Gawn on a line 900 feet long. The usual course brings vessels a mile and a half or two miles south of the entrance of the canal, as they approach Minnesota Point. At some distance from the shore the crew of the Harper discovered the lights of the harbor and of the piers. The wind was blowing from the northwest at the rate of between 35 and 40 miles an hour, so that it was running at nearly right angles with the course of the canal. After the lights were discovered the Harper shifted its course toward the north and ran into the wind. It signaled the Gawn to shorten its tow line. It signaled for a tug. It subsequently gave a signal to the Gawn to make fast its line. It turned to port and ran into the canal. The Gawn failed to shorten its line because it was too taut. It drifted to leeward as the Harper entered the canal and struck the south pier. The facts which have been thus far recited are not in dispute and they are not decisive of the questions in the case. The testimony of the witnesses for the respective parties in regard to the facts which condition the determination of the issues in this case is in hopeless conflict. The witnesses agree that at some place within seven miles of Duluth the Harper was south of the projected line of the canal, that she shifted her course toward the north, ran into the wind until she reached or passed that line, and that she subsequently turned to port and entered the canal. It goes without saying that when the Harper headed toward the northwest into the wind the Gawn must have tailed off to leeward on a line approximately at right angles to the line of the canal and that as they approached the harbor an obvious danger arose which no navigator of skill or prudence could have failed to perceive and to endeavor to avoid, the danger that a turn of the Harper to port at a point too near the canal would draw the barge upon the south pier. The evidence for the respective parties is addressed to the acts of the masters and crews of the two vessels in respect to this acknowledged danger. The witnesses for the libelants are the master and the members of the crew of the Gawn, the wheelsman of the Harper, the master of a tug which answered the signal and picked up the Gawn after the accident and the keeper of the light house. Their evidence is that

the Harper followed the usual course of vessels coming from the vicinity of Devil's Island to Duluth until she was a mile and a half or two miles southward of the entrance to the canal, that she then ran northwesterly into the wind, checked her speed or stopped, signaled the barge to shorten the tow line, signaled for a tug, subsequently signaled to make fast the tow line and then when she was from a quarter to a half a mile easterly of the entrance to the canal headed to port, squared away for the canal and ran into it at the rate of 10 miles an hour. These witnesses say that the northwesterly wind constantly drifted the barge to leeward, that the tow line was so taut that the crew could not shorten it and that the attempt of the master of the Harper to enter the canal while the barge was drifting out to the leeward on its long line under the strong northwesterly wind was the cause of the accident.

On the other hand, the master and the members of the crew of the Harper testify that they shifted her course toward the north at a point about six miles out in the lake and ran into the wind until they crossed the projected line of the canal and opened the range lights to the northward at a place about three miles out, that they then gave the signal to shorten the tow line and for the tug, checked and held the steamer in its place for half an hour, then signaled to the barge to make the line fast, headed the steamer and kept her on a course north of the line of the north pier until she came within 100 or 200 feet of the canal when they starboarded her wheel so that she would clear the north pier and then ported it and sent her at full speed through the canal about 75 feet south of the north pier. They testify that the Gawn followed nicely, that she came up north of the extended line of the north pier and did not drift off to leeward until she was from 75 to 600 feet of the piers when she suddenly sheered to the southward and struck the south pier.

The court below was unable to credit the story of the master and crew of the Harper, and concluded that they ran into the canal when the barge was drifting to leeward so far under the heavy northwesterly wind that a navigator of ordinary prudence and skill would have held the vessels out in the lake until a tug arrived, or would have taken some other course to avoid the plain danger of the collision and that this negligence of the master of the Harper was the cause of the accident. A careful examination of the testimony in the light of the briefs and arguments of counsel and the established rules of law applicable to a case of this nature has failed to lead our minds to a different conclusion. At some place within seven miles of Duluth the Harper was from one to two miles south of the projected line of the canal. At some time after she arrived at this place she ran in a northwesterly direction to, or across that line. When she arrived at the line the barge must have been far to her leeward on the 900 feet of line. The witnesses for the Harper say that after this the Harper ran for more than two miles on a course north of the extended line of the north pier before she squared away

to enter the canal and that the Gawn followed her on that course north of the line of the north pier. They say that the Harper and the Gawn then came down to the south and the former entered the canal. This testimony has failed to convince not only because the members of the crew of the Gawn testify that the latter vessel never followed the Harper on that course north of the north line of the canal but that she continually drifted to leeward, and that she directly followed only when the Harper was headed into the wind, but also and chiefly because it is improbable that a vessel light towed by a line 900 feet long at a speed of not more than 10 miles an hour through a wind abeam of 35 miles an hour would not drift to leeward, because with her wheel hard aport, as the evidence convinces us it was, she did drift in that direction until she struck the south pier, and because the master of the tug who came out in answer to the call of the Harper, and the lighthouse keeper, both apparently disinterested witnesses, testify: The former that when he first saw the Harper she was out about a quarter of a mile, was headed northwest and looked to be coming from the southward; and the latter that when he first perceived her he was on the eastern end of the south pier, that she was a quarter to a half a mile south of the south pier and that he estimated that she was from a quarter to a half a mile out in the lake. The lighthouse keeper was on the south pier. No witness was in a better position to determine whether the steamer came to the line of the canal from a course north of the line of the north pier, as her witnesses declare, or from some point south of the line of the south pier, as the master and members of the crew of the Gawn testify, and there is no reason to believe that his evidence was influenced by interest or prejudice or that it was untrue. Doubtless the distances given by the various witnesses in their evidence are inaccurate, for they were necessarily estimates. The evidence is voluminous and contradictory, but it has borne in upon our minds the conviction that the master of the Harper came up from the southward with a barge tailing off to leeward on its long line, that as he approached the entrance to the canal the Gawn was still drifting far to leeward, that under these circumstances a navigator of ordinary skill and prudence would have perceived and would have avoided the danger of her collision with the south pier, and that his failure to do so was poor seamanship and a lack of ordinary care which caused the disaster. A steamer which engages to tow a vessel to a port is required to exercise reasonable skill and care in everything relating to the work, including the entrance to the port, until the service has been rendered, and the lack of either charges her with liability for the damage which it causes. The Margaret, 94 U. S. 494, 24 L. Ed. 146.

The court below was of the opinion that the master of the Gawn was guilty of negligence which contributed to the injury, because he failed to throw off or to cut the line when he discovered that his vessel would strike the pier. His vessel was without power, and the primary duty and responsibility for her safe transportation fell upon the master

of the Harper. It was the province of the latter, and not that of the former, to consider and determine in the first instance whether or not he could safely tow the barge through the canal, and, when he had reached this decision, it was his duty to exercise reasonable care and skill to do so. The extent of the duty of the master of the barge was to use ordinary care to follow the steamer, to obey her master and to avoid obstructions and injuries. The master of the Harper had signaled for a tug and until he squared away his steamer to enter the canal the master of the Gawn naturally supposed that the Harper would wait without the canal until the tug arrived. The master of the steamer was in the better position to observe the danger, and to provide against it and the master of the barge naturally relied upon the presumption that he would exercise reasonable skill and care to do so. It was not until the Gawn was within 200 feet of the pier, while it was moving at the rate of 10 miles an hour, that its master knew that the master of the steamer had committed an act of negligence and that the barge would strike the pier. The collision occurred in about 17 seconds thereafter. South of the pier stretched the beach of Minnesota Point, where his barge might have stranded if he had cut the line. In that event he would probably have been called upon to meet the claim of the owners of the Harper that he would have passed the pier in safety if he had relied on the master of the steamer and had held fast his line. The time between his knowledge of the danger and the collision was too short, the chances of safety were too doubtful; the disaster was too imminent, when the master of the Gawn discovered his danger, to render his subsequent inaction before the collision any want of reasonable care. Where a vessel has been brought into imminent danger by the negligence of another, she may not ordinarily be condemned for any error of her master while she is in extremis, and he is endeavoring to extricate her (The Ludvig Holberg, 157 U. S. 67, 15 Sup. Ct. 477, 39 L. Ed. 620), and the testimony in this case fails to convince that the master of the Gawn committed any error.

The proctor for the owners of the Harper makes other claims of negligence on the part of the master of the Gawn. He insists that the Gawn was negligent because she failed to shorten her tow line, and failed to signal that she had not done so, but the testimony convinces that the wind kept the line so taut that she could not safely shorten it, and that the lights of the Gawn and her distance were perceptible to the master and crew of the Harper as the latter approached and entered the canal; because she failed to use her centerboard, but the weight of the testimony is that she used it; and because she eased up on her wheel as she approached the piers and thereby permitted herself to sheer to leeward and to fall into collision, but the record convinces that her wheel was hard aport all the time after the Harper squared away for the canal. These various charges of contributory negligence were not sustained by the court below, and our conclusion is that the evidence fails to support them.

The decree below must accordingly be reversed, and the case must

be remanded to the district court, with instructions to enter a decree for the libelants for the amount of the damages, interest, and costs; and it is so ordered.