## THE NORNE.

### RIISE et al. v. SIPSEY BARGE & TOWING CO., Inc., et al.*

### No. 6463.

Circuit Court of Appeals, Fifth Circuit.

June 11, 1932.

John D. Grace, M. A. Grace, and Edwin H. Grace, all of New Orleans, La., for appellants.

Geo. H. Terriberry, Jos. M. Rault, and Selim B. Lemle, all of New Orleans, La., for appellees.

Before BRYAN, SIBLEY, and HUTCHESON, Circuit Judges.

BRYAN, Circuit Judge.

This is an appeal from a decree in admiralty adjudging the tank steamer Norne solely at fault, and exonerating the tug De Bardeleben and its tow, the barge Oriole, from blame, for a collision in which all three vessels were involved. The original libel filed on behalf of the Norne was dismissed, and the cause retained for award of damages sustained by the tug and barge on whose behalf cross-libels were filed.

The collision occurred off Algiers Point in the harbor of New Orleans, shortly after midnight on a dark but clear night in April, 1927, while the river was at flood stage, with an unusually rapid current of 5 or 6 knots an hour. At Algiers Point, which is on the west bank across the harbor from the city proper, the river takes a right angle turn; and just above there is an eddy which causes the current to run upstream along the western shore. The river at this point is 1,600 feet wide. Probably because of its great depth and conflicting currents, especially at very high stages of water, numerous boils appear and

*Rehearing denied August 8, 1932.

interfere with safe navigation. Christie & Lowe v. Fane S. S. Co. (C. C. A.) 159 F. 648. The Norne, a steel ship 400 feet long, fully loaded with gasoline, with draft of 25 feet, bound down the river on a foreign voyage, was proceeding through the harbor at full speed, which with the aid of the current amounted to from 13 to 15 knots an hour. At the same time the De Bardeleben, a tug 150 feet long, was proceeding up the river at a speed of about 6 knots an hour with the Oriole in tow on a steel hawser. The Oriole was 220 feet in length, had no cargo, and was drawing 9 feet at the bow and 14 feet aft. She was originally a bark but had been converted into a schooner barge. The De Bardeleben, as she approached Algiers Point with the Oriole in tow, discovered the Norne some distance up the river, initiated a two-blast signal for a passage starboard to starboard which was answered and agreed to by the Norne. The De Bardeleben was displaying three towing lights which, the pilot on the Norne understood, indicated that a vessel was being towed astern on at least a 600-foot length of hawser. The Norne without slackening speed ran into the hawser, and then struck on her port side about amidships against the bow of the Oriole with such force as to do considerable damage to both vessels. Just before the collision, when it had become apparent that the Norne was going to pass between the tug and the barge, the tug released the brakes on its towing machine, thereby permitting the hawser to run out on a free spool, reversed its engine, and backed full speed astern with the intention of slackening the hawser in order that the Norne might pass over it; at the same time the barge's helm was put hard astarboard. Immediately following this maneuver, the tug was sent full speed ahead to keep it from colliding with the Norne. The end of the hawser, the full length of which was 1,700 feet, was torn loose from the towing machine to which it was fastened by a bolt. After the collision the Oriole, dragging the hawser after her, started astern and was swept by the downstream current against a wharf on the New Orleans shore; and the Norne anchored a short distance down the river below Algiers Point.

The principal disputed question of fact is where in the river the collision occurred; whether on the New Orleans side as is contended on behalf of the Norne, or on the Algiers side as was held by the District Judge. There is also some controversy about the length of hawser that was used in towing, and the sufficiency of the side lights on the Oriole.

On the admitted facts the Norne finds fault: With the De Bardeleben, because it was using a towline instead of towing alongside; because it had out too much towline; had no appliance for instantly releasing it; was not running fast enough to maintain steerageway or to keep the Oriole from sheering; did not have a lookout stationed on the rear to warn the Oriole of the dangerous sheer; and because, when the collision was imminent, its maneuvers in backing full speed astern and then going full speed ahead resulted first in the Oriole getting out of control and being swept out across the middle of the river, and then being dragged by the towline into the side of the Norne. With the Oriole, on the grounds that her side lights were so improperly located and held in position that they were not visible to an approaching vessel, that she was undermanned, had no lookout on the bow, did not follow in the wake of the tug, and failed to cut the manila line by which the hawser was made fast to her bow.

The master, and three other officers or members of her crew, testified that the Norne, after passing signals were exchanged, shaped her course so as to remain in the bend of the river as close to the New Orleans side as it was safe to navigate; that they passed within about a ship's length or 400 feet of the De Bardeleben; that they did not see any lights on the Oriole, or see the Oriole herself until she loomed up on their port side, 100 to 150 feet away. These witnesses were foreigners, and unacquainted with the harbor. The pilot on the Norne, who was thoroughly familiar with the harbor, testified that the De Bardeleben was only about 300 feet out from the Algiers shore, and that the Oriole was a little less than one-third the width of the river out from the New Orleans shore. He admitted that after he had passed her bow he saw a red light which appeared to be the proper, ordinary kind of side light usually carried to give warning to approaching vessels, but was unable to say whether it was on the Oriole or on shore. In other particulars he corroborated the testimony of the Norne's officers and crew. According to the testimony of the master, chief officer, and chief engineer of the De Bardeleben, and the master of the Oriole, the De Bardeleben was within 300 feet and the Oriole within 450 feet of the Algiers side, rounding Algiers Point, at the time of the collision. The distance between the Norne and the De Bardeleben, as they passed each other, was not over 150 feet. The length of the towline in use was variously estimated at from 300 to 400 feet. The red and green lights on the Oriole, which

other evidence disclosed had been moved aft from the forward rigging to the poop subsequently to the conversion of that vessel into a barge, and had been approved in their new positions upon several annual inspections made pursuant to 46 USCA § 395, were good serviceable lights, were burning, and were so placed that they were visible to approaching vessels. The Oriole had not sheered, but had only swung somewhat further out in the river than had the De Bardeleben in rounding Algiers Point. The master of the De Bardeleben testified that at all times he had a plain view of the Oriole, and did not need a lookout astern. He said the towing length of the hawser had been shortened at the mouth of the river. He admitted that by towing astern instead of alongside he could make better time; but claimed that he could also avoid the driftwood that had accumulated in the flood waters of the Mississippi, whereas, if he had been towing alongside, driftwood would in all probability have been caught between the tug and the tow, and it might in that event have been necessary to stop and unhitch in order to get it out, with the attendant danger of breaking his propellor, as had happened a short time before while he was towing a vessel alongside. The Oriole had two in her crew besides the master and the cook. The master and one member of his crew were on watch. The steel hawser was made fast on the head of the Oriole by a couple of turns around the bitts, and a manila line was run through an eye on the end of it and carried over to a mooring bitt. By cutting the manila line, the hawser could be immediately released. The testimony of the officers of the tug and of the tow, to the effect that the collision occurred close up to Algiers Point, was corroborated by the pilot of the Canal Street ferry, who was on his boat at the Algiers landing a short distance above the Point; and by the pilot and two members of the crew of a car ferry which had left its landing, located a quarter of a mile below the Point on the Algiers side, to cross to the New Orleans side immediately ahead of the De Bardeleben. In addition, the witnesses on the car ferry testified that they observed both red and green lights on the Oriole. A dock board patrolman on the New Orleans side also testified that he saw the green light on the Oriole before the collision and both her red and green lights shortly after the collision. The pilot of the Canal Street ferry, who said that after the passing signals were exchanged he observed the De Bardeleben rounding the Point, and the Norne abreast of his ferryboat about 400 feet out from the Algiers shore, said also

that he heard the collision but did not see it, as his view was obstructed by a dock.

There is a custom on the Lower Mississippi river, of such long standing that it has the force of law, that descending vessels should run the bends and take advantage of the current, and ascending vessels should come up under the points and get the benefit of slack water. Managua Nav. Co. v. Aktieselskabet Borgestad (C. C. A.) 7 F.(2d) 990; The Stephen R. Jones (C. C. A.) 27 F.(2d) 208. The passing signal, initiated by the De Bardeleben and accepted by the Norne, complied with this custom. Therefore, the Norne was doubly placed under the duty of remaining in the bend on the New Orleans side. The great preponderance of the evidence, in our opinion, shows that instead the Norne cut across close to Algiers Point where the De Bardeleben and the Oriole properly were, under both the local rule of navigation and the passing agreement. Three officers and members of her crew testified, it is true, that the Norne remained in the bend where she ought to have been, but they were in a harbor that was strange to them, and could easily have been mistaken. The pilot, with his more intimate knowledge of the harbor, concedes that the De Bardeleben was in her proper position on the Algiers side. He undertakes to say that the Oriole was over toward the New Orleans shore almost abreast of the De Bardeleben. The witnesses for the Norne are flatly contradicted by those who were on the tug and the tow; and also by several disinterested witnesses, namely the pilot of the Canal Street ferry and the three men who were operating the car ferry. If the collision had occurred as far out as the middle of the river or in the bend on the New Orleans side, the view of the pilot on the Canal Street ferry could not have been obstructed by the dock on the Point, but he could easily have seen the Oriole. Moreover, in that event, the testimony of the witnesses on the car ferry would have to be rejected on the ground that they were honestly mistaken or had not testified truthfully when they said that the place of collision was close up to the Algiers shore. The testimony of these disinterested witnesses cannot well be rejected on the ground of honest mistake, as they were intelligent witnesses and knew intimately, from long observation and daily experience, that part of the river and the location of objects along its banks. Nor is there anything in their testimony which is unreasonable or contradictory, or which forms the basis for an inference that they were unreliable witnesses. If the

Norne passed within 150 feet, or even within a ship's length, of the De Bardeleben, it is almost certain the collision occurred on the Algiers side. It is conceded that the pilot on the Norne saw the towing lights on the De Bardeleben, and consequently knew that a vessel was being towed on a hawser. It was inexcusable negligence on his part to proceed at full speed under the stern of the De Bardeleben without knowing the position of the tow. If the lights of the Oriole were not visible, there was all the more reason for the Norne to slow down before she arrived abreast of the De Bardeleben. Those in charge of the navigation of the Norne had no right to assume, as they probably did, that the tow was as close in shore as was the tug, and that the latter hid the former's side lights from view. The faults of the Norne, in pursuing the wrong course and in proceeding upon it at full speed, were enough to cause the collision, if indeed they did not make it inevitable. They were at least so gross as to cast upon the Norne the burden of proving by clear and convincing evidence contributory fault on the part of another vessel involved in the collision. Any doubts arising from such proof are to be resolved in favor of the De Bardeleben and the Oriole. The City of New York, 147 U. S. 72, 85, 13 S. Ct. 211, 37 L. Ed. 84; The Ludvig Holberg, 157 U. S. 60, 15 S. Ct. 477, 39 L. Ed. 620; The Umbria, 166 U. S. 404, 17 S. Ct. 610, 41 L. Ed. 1053; The Victory & The Plymothian, 168 U. S. 410, 423, 18 S. Ct. 149, 42 L. Ed. 519.

As to the faults claimed against the De Bardeleben and the Oriole. A tug is not absolutely required to tow alongside in the Mississippi river, or even in the harbor of New Orleans. We are not prepared to say that the presence of driftwood in the swift current of the river was not sufficient justification for using a hawser; for, as explained by the master of the tug, and not denied, in time of high water and swift current driftwood frequently gets caught between tug and tow traveling side by side, and there is danger involved as well as time lost in separating them in order to set the driftwood free. The only evidence as to the length of the towline in use was that given by witnesses who were on the tug or the tow to the effect that it was not over 400 feet long. The three towing lights did not indicate a towline of 600 feet or more, as was erroneously supposed by the Norne's pilot, or that only one vessel was being towed, as the tug's pilot and master seems to have thought; at most, they gave information that the combined length of the hawser in use and the tow exceeded 600 feet.

33 USCA §§ 73, 173. But these lights, as interpreted by the Norne's pilot, indicated that a vessel was being towed astern on a hawser, and caused no confusion. However, because of his erroneous interpretation of their true meaning, the pilot concluded that the towline in use must have been at least 600 feet in length. It is not clear that the collision would have been avoided if the towline had been equipped with a device for separating it at the forward end, or if the manila line on board the Oriole had been cut. The brakes on the towing machine were released as soon as it became apparent that a collision was probable, with the result that the towline immediately began to run out on a free spool but did not have time to sink to the bottom before it was picked up by the Norne. The use of the tug's device for releasing the towline would probably have prevented a collision but for the Norne's excessive speed. If the Norne had been proceeding at a more moderate rate of speed, in all probability the released towline would have sunk to the bottom and the Norne would have passed safely over it; and possibly a collision might have been avoided by a very narrow margin. Certainly, no harm came from the maneuvers of backing full speed astern in an effort to get the towline under the Norne, and then going full speed ahead to keep the tug out of the collision. It was not any movement of the tug that caused the towline to get caught on the Norne, but that happened despite all efforts to prevent it. The method adopted by the tug has this in its favor, that if the Norne had passed over the towline there would have been a chance to reel it in and continue with the tow which otherwise would have been left adrift and liable to get into some other collision. In any event, the tug was acting in an emergency which was brought about by the fault of the Norne, and is not to be held strictly to account for what it did in the situation that confronted it. The tug is to be commended rather than blamed for not proceeding at full speed through the harbor. The George H. Jones (C. C. A.) 27 F.(2d) 665. There is no evidence that it was not running fast enough to maintain steerageway and to keep the tow from sheering, or that the tow sheered at all. As the master and pilot were both on duty and were keeping up with the movements of the tow, it cannot reasonably be inferred that their failure to have a lookout on the rear was a contributing fault. The two men on watch on the Oriole were all that were needed to handle the steering wheel and see that she followed in the wake of the tug.

It hardly is consistent with the rule that requires cautious navigation on the part of each of two meeting vessels to insist, on the one hand that the Norne, without taking the ordinary precaution to ascertain the position of the Oriole, had the unqualified right to proceed on her course in the nighttime at full speed through the turbulent waters of the harbor; and on the other that the Oriole ought to have had a lookout stationed on the bow with ax in hand ready to cut the manila line. The Lizzie M. Walker (C. C. A.) 3 F.(2d) 921; Johnson v. United States (C. C. A.) 4 F.(2d) 102. The side lights of the Oriole had been subjected to several annual inspections, and their positions on the poop had received the approval of the Government inspectors. Not only interested but several disinterested witnesses testified that they were bright and visible. The three witnesses who were on the car ferry, and had an opportunity to observe them just before, at the time of, and just after the collision, gave testimony which amply supports the inference that they could have been seen by the pilot and crew of the Norne.

In our opinion it cannot be said with any show of reason that any fault either of the tug or the barge proximately contributed to the collision. The case for the Norne, aside from the contention that she remained in the bend upon the New Orleans side, depends upon theories conceived after the event, as to place of collision, length of towline, failure to maintain steerageway, sheering, absence or insufficiency of side lights on the Oriole. Upon these theories the collision is sought to be explained in such manner as to exculpate the Norne, or at least to make out a case for apportionment of damages. Our conclusion is that the Norne has wholly failed to support its theories by proof, and that it has been shown by competent and trustworthy evidence to have been solely at fault.

The decree is affirmed.