## UNITED STATES v. THE GYPSUM PRINCE.

## GYPSUM PACKET CO., Limited, v. UNITED STATES.

## THE ATLANTIC.

## THE GYPSUM PRINCE.

Nos. 16151, 16233.

District Court, E. D. New York.

April 17, 1942.

Harold M. Kennedy, U. S. Atty., of Brooklyn, N. Y. (Myron H. Avery, Sp. Asst. to U. S. Atty., of Washington, D. C., of counsel), for libellant and cross-respondent).

Barry, Wainwright, Thacher & Symmers, of New York City (Earle, Farwell, of New York City, of counsel), for claimant-respondent and cross-libellant.

ABRUZZO, District Judge.

The United States of America, as owner of the United States Army Engineers' dredge "Atlantic", filed a libel against the Gypsum Packet Company, Ltd., and its steamship "Gypsum Prince", for damages incurred as a result of a collision between

the two vessels. The Gypsum Packet Company has filed a cross-libel herein.

The collision occurred on December 19, 1940, in the lower Delaware River. The government was dredging a 1,000-foot wide, 40-foot deep channel which was being dug from the Ocean to Philadelphia, Pennsylvania. The dredge "Atlantic" was being used in the performance of that work.

There was due notice of the dredging operations and the presence of the buoys which marked the dredging area by means of "Notice to Mariners", issued by the Coast Guard. In the November 27, 1940, issue (libellant's Exhibit 8), information was published to the effect that operations would be in progress about December 1, 1940, and that the buoys would be re-established. The "Notice" for December 18, 1940 (libellant's Exhibit 8), announced the establishment of the dredging buoys in the area.

The "Atlantic" arrived from Norfolk in the Delaware River on December 14, 1940. The dredging area on December 19, 1940 (the date of collision), was on the so-called Brandywine Range, between Stations 475 and 480, a distance of some 5,000 feet, and Buoys J and H (Libellant's Exhibit 5). At the time of the collision, the "Atlantic" was dredging on the east edge of the east half of the new 1000 feet channel. Prior to the vessels' coming in contact with one another, there was never any dredging on the west half.

At 10:15 P. M., when the collision occurred, it was dark and clear. The tide was running westerly with a force of about 1½ miles, the wind being southeast, force 3.

The dredge had turned around and started in a southerly direction toward buoy H at about 9:50 P. M. and had been on this course about twenty-five minutes before the collision. She was about 100 feet off a line extending between buoys J and H. As these buoys were 100 feet beyond the edge of the dredged channel, the "Atlantic" was on the eastern edge of the 1,000-foot dredging area.

The "Atlantic" is a seagoing self-propelled steam dredge, 288 feet in length and 47 feet six inches in width. She resembles an ordinary merchant vessel, in that she has two masts and a smokestack, and her hull has the general shape of an ordinary vessel. She is equipped with suction pipes or drags, which are lowered to the bottom and through which mud and sand are pumped into the hold or interior of the vessel. During dredging operations, she proceeds under her own power and drags the suction pipes along the bottom.

The "Gypsum Prince" is a British merchant vessel 347.8 foot in length and 52.8 feet in width. She is a steam vessel and is equipped with a single screw. She was outward bound from Philadelphia for Nova Scotia.

The "Gypsum Prince" was overtaking the "Atlantic" and was proceeding on a parallel course.

It is undisputed that the collision occurred in the dredging area and that the area was properly marked. It is conceded that the "Gypsum Prince" knowingly entered this dredging area with the "Atlantic" in clear view and ahead of the "Gypsum Prince".

The libellant contends that all the evidence leads to the conclusion that the "Gypsum Prince" is entirely responsible for the collision.

The "Atlantic" was proceeding at a very slow rate of speed of 3 miles per hour (Berlucci Dep. pp. 7, 8); her starboard engine was at full speed ahead and her port engine half speed; this was to counteract the set of the current.

The quartermaster of the "Atlantic", glancing back, saw the "Gypsum Prince" off the dredge's starboard quarter about 800 to 1000 feet distant. He called to Captain Hammerseth who was on the port wing of the dredge's bridge. The captain crossed over to the starboard side of the bridge and looked aft at the "Gypsum Prince". He ordered the quartermaster to "keep her steady as she goes". At that moment, he calculated that the "Gypsum Prince" was going to cross behind the stern of the dredge, passing by the stern.

A collision became imminent. The captain pressed the buzzer or signal for hoisting the dredge's drags off bottom. The dragtenders immediately operated the apparatus which caused the hoisting engines to raise up the suction pipes from bottom. Thinking that the "Gypsum Prince" would strike the dredge "Atlantic" at the suction line and that the metal shoe at the end of the pipe would puncture a hole in the dredge, the dragtender dropped his pipeline back below the surface of the water in order to avoid a possibly more serious col-

lision. At the same time, the captain sounded a general alarm and operated the apparatus to close the vessel's bulkhead doors in the event that she should be breached by the collision. He also rang a full ahead on the port engine which had previously been operated at half speed. Since there was a probability of the "Gypsum Prince" colliding with the stern of the dredge, the captain attempted to throw his stern away from the oncoming "Gypsum Prince", by a hard starboard rudder order. This order was executed as well as an order of "Stop" and "Astern". Thereafter, a stop order was given on both engines.

As a result of the two vessels' colliding, the hoisting apparatus on the starboard side of the dredge was rendered useless. The proof indicates that the starboard side of the "Atlantic" was struck by the "Gypsum Prince".

The government, which is the libellant and cross-respondent, claims that the "Gypsum Prince" was guilty of the following:

1. Negligence in having entered the marked buoyed lighted dredging area.

2. Violation of Inland Rule of Navigation No. 24 as to overtaking vessels.

3. Violation of the Starboard Hand or Narrow Channel Rule, Inland Rule No. 25.

4. Violation of Inland Article 18, Rule VIII, relative to passing a vessel without permission.

5. Violation of Pilot Rule 9, the rule for speed of vessels passing floating plant working in channels.

6. Holding her course when the dredge "Atlantic" was seen to be sheering toward the "Gypsum Prince".

7. Failing to reduce her speed after a dangerous situation became apparent.

The "Gypsum Prince" does not dispute that she was overtaking the "Atlantic". Her navigation was in charge of a Deleware River Pilot of long experience. The "Gypsum Prince" observed the lights of a vessel ahead which proved to be the "Atlantic". She was underway and was proceeding in the same direction as the "Atlantic". When the "Gypsum Prince" was about half a mile from the "Atlantic" her pilot sounded one whistle to the dredge, altered his course to starboard and then straightened up on the channel course. The courses that the vessels were on were such that the

"Gypsum Prince" would pass on the starboard side of the dredge at a distance of from 200 to 100 feet. The "Gypsum Prince" held her course. When the bow of the latter was overlapping the stern of the "Atlantic", the dredge sheered to her starboard toward the "Gypsum Prince". The wheel of the "Gypsum Prince" was put hard-astarboard (right rudder) in order to avoid colliding with the "Atlantic". The "Gypsum Prince" claims that the dredge continued to sheer to her starboard and as the bow of the former swung to her starboard and her stern went to port, the port quarter of the "Gypsum Prince" hit the starboard side of the "Atlantic".

It is maintained that no collision would have occurred if the "Atlantic" had kept her course because the "Gypsum Prince" was passing at a safe distance and would have passed without difficulty but for the sheer of the "Atlantic".

These are the two versions of the cause of the collision.

The "Gypsum Prince" was negligent in entering the marked buoyed lighted area in which the "Atlantic" was dredging. The evidence discloses that the navigator of the "Gypsum Prince" knew that dredging operations were in progress in this section of the lower Delaware River (Rec. p. 123). He also saw the red and white lights marking the dredging area (Rec. pp. 123, 124).

It is conceded that the "Gypsum Prince" was in the marked dredging area at the time of the collision (Rec. p. 126). It is therefore clear that the primary cause of the collision was the entering of the "Gypsum Prince" into that particular area although she had more than 1,000 feet of open water on the other side of the channel in which she could have chosen to navigate.

The able-bodied seaman at the wheel of the "Gypsum Prince" testified that the "Atlantic" swung to the right across the path of the "Gypsum Prince" and that if she had continued on her original course the collision would not have occurred. The navigator of the "Atlantic", aware that a collision was imminent, maneuvered her in order to attempt to avoid it as is evidenced by the captain's testimony to the effect that he saw the danger of a collision, gave the signal for hoisting the drags and operated the apparatus to close the bulkhead doors (Rec. pp. 34, 35). At the same time, he rang full ahead on the port

engine. This might have swung the "Atlantic" off her original course, but this was precipitated by the negligence of the "Gypsum Prince" in being in the marked buoyed lighted dredging area and being navigated so close to the "Atlantic" as to cause alarm at an impending collision.

The "Atlantic" was maneuvered as any ordinary, careful pilot would be expected to navigate under the circumstances. If the "Gypsum Prince" had been a greater distance off the starboard of the "Atlantic", there would have been no necessity for the "Atlantic" to change her course in an endeavor to avoid a collision. There is no force to the argument advanced by the "Gypsum Prince" that she would have passed the "Atlantic" safely at a distance of 100 feet if the latter had kept her course. The "Gypsum Prince" was closer to the "Atlantic" than that. She was, in fact, shaving the dredge. No possible explanation of such navigation has been offered. The argument advanced by the "Gypsum Prince" in order to avoid responsibility for the collision is farfetched and untenable.

In such an instance, where the fault of one vessel is gross, the Court cannot sanction searching for a putative minor fault on the part of the other vessel. This rule is expressed in The City of New York, 147 U.S. 72, at page 85, 13 S.Ct. 211, at page 216, 37 L.Ed. 84: " * * * In view of the recklessness with which the steamer was navigated that evening, it is no more than just that the evidence of contributory negligence on the part of the sailing vessel should be clear and convincing. Where fault on the part of one vessel is established by uncontradicted testimony, and such fault is, of itself sufficient to account for the disaster, it is not enough for such vessel to raise a doubt with regard to the management of the other vessel. There is some presumption at least adverse to its claim, and any reasonable doubt with regard to the propriety of the conduct of such other vessel should be resolved in its favor. * * * "

See also The Victory, 168 U.S. 410, at page 423, 18 S.Ct. 149, at page 155, 42 L.Ed. 519:

" * * * As between these vessels, the fault of the Victory being obvious and inexcusable, the evidence to establish fault on the part of the Plymothian must be clear and convincing, in order to make a case for apportionment. The burden of proof is upon each vessel to establish fault on the part of the other.

"The recognized doctrine is thus stated by Mr. Justice Brown in The Umbria, 166 U.S. 404, at page 409, 17 S.Ct. 610 [41 L.Ed. 1053]: 'Indeed, so gross was the fault of the Umbria in this connection that we should unhesitatingly apply the rule laid down in The City of New York, 147 U.S. 72, 85, 13 S.Ct. 211, [37 L.Ed. 84]; and The Ludvig Holberg, 157 U.S. 60, at page 71, 15 S.Ct. 477 [39 L.Ed. 620], that any doubts regarding the management of the other vessel, or the contribution of her faults, if any, to the collision, should be resolved in her favor.' * * * "

The cases cited by the "Gypsum Prince" in support of its claim apply to instances where the dredging operations were in the usual and customary channel with no alternative route. The contrary conditions exist in the case at bar inasmuch as there was ample space on the other side of the channel in which the "Gypsum Prince" could have proceeded safely. There were no other vessels in that part of the lower Delaware River at the time of the collision.

It must be borne in mind that in determining the liability of the respective vessels, the burden is upon the overtaking vessel to keep clear of the overtaken vessel until she has passed the latter vessel.

The "Gypsum Prince" claims to have sounded a one-whistle warning to the "Atlantic" that she intended to pass. Little faith or credence can be placed in this testimony. The Court is of the belief that a one-whistle signal was not sounded. This added to the confusion of the captain of the "Atlantic" as to just what course the "Gypsum Prince" intended to steer. The manner in which the "Atlantic" was maneuvered just prior to the collision is indicative of the confusion created by the "Gypsum Prince". The captain of the "Atlantic" by skillful navigating of his vessel endeavored to avoid the collision but was unable to do so. Under these circumstances, liability for the collision cannot be attached to the "Atlantic". The collision was caused solely by the negligent operation of the "Gypsum Prince".

The "Gypsum Prince" not only negligently entered the marked buoyed lighted dredging area, but she gave no heed to Inland Rule of Navigation No. 24, which provides:

## Overtaking Vessels

"Art. 24. Notwithstanding anything contained in these rules every vessel, overtaking any other, shall keep out of the way of the overtaken vessel.

"Every vessel coming up with another vessel from any direction more than two points abaft her beam, that is, in such a position with reference to the vessel which she is overtaking that at night she would be unable to see either of that vessel's side lights, shall be deemed to be an overtaking vessel; and no subsequent alteration of the bearing between the two vessels shall make the overtaking vessel a crossing vessel within the meaning of these rules, or relieve her of the duty of keeping clear of the overtaken vessel until she is finally past and clear.

"As by day the overtaking vessel can not always know with certainty whether she is forward of or abaft this direction from the other vessel she should, if in doubt, assume that she is an overtaking vessel and keep out of the way."

This rule of navigation was willfully and negligently violated. It adds to and corroborates the negligence of the "Gypsum Prince" in entering the marked buoyed lighted dredging area.

It is therefore inescapable that the libellant is entitled to a decree and that the cross-libel must be dismissed. The Court finds that the "Atlantic" was skillfully navigated and no blame or fault attached to her.

### Findings of Fact

1  The libellant's vessel, "Atlantic", is a United States Army Engineers' Dredge.

2. The claimant-respondent, steamship "Gypsum Prince", is a British merchant vessel with a single screw.

3. The collision which caused the damage for which recovery is sought occurred on December 19, 1940, in the lower Delaware River, at about 10:15 p.m., it being a clear, dark night.

4. The "Atlantic" was engaged in dredging a 1,000-foot wide, 40-foot deep channel from the ocean to Philadelphia, Pennsylvania.

5. At the time of the collision, the "Atlantic" was dredging on the so-called Brandywine Range, between Stations 475 and 480, a distance of some 5,000 feet, and Buoys J and H. At about 9:50 p.m., on December 19, 1940, she was proceeding in a southerly direction toward Buoy H, placing her on the eastern edge of the 1,000-foot dredging area.

6. The "Gypsum Prince" was overtaking the "Atlantic" and was proceeding on a parallel course, outward bound from Philadelphia for Nova Scotia.

7. The "Gypsum Prince" had notice of the dredging operations and observed the red and white lights marking the dredging area.

8. The "Gypsum Prince" saw the "Atlantic" ahead and intended to overtake and pass her.

9. There were no other vessels in that part of the lower Delaware River at the time of the collision.

10. There was an ample expanse of water of over 1,000 feet to the right of the channel dredging area in which the "Gypsum Prince" could have been navigated.

11. The "Gypsum Prince" was navigated in such a manner that she was shaving the "Atlantic".

12. The "Gypsum Prince" did not sound a one-whistle warning to the "Atlantic" that she intended to overtake and pass the "Atlantic".

13. The starboard side of the "Atlantic" was struck by the "Gypsum Prince".

14. The "Atlantic" was showing proper lights.

### Conclusions of Law

1. The "Gypsum Prince" was negligent in entering the marked buoyed lighted dredging area.

2. The "Gypsum Prince" was at fault for failing to sound a one-whistle warning that she intended to overtake and pass the "Atlantic".

3. The "Gypsum Prince" was at fault in failing to keep out of the way of the "Atlantic" in violation of Inland Navigation Rule No. 24.

4. The "Gypsum Prince" was negligently navigated so that she shaved the "Atlantic" although ample space to the right was available in which she could have proceeded.

5. The "Gypsum Prince" was negligently operated so as to be solely responsible for the damage incurred.

6. The "Atlantic", under the circumstances, was skillfully maneuvered and free from blame.

7. Libellant is entitled to a decree in its favor.

8. The cross-libel is dismissed.

Settle order on notice in accordance with this decision.