## THE WYDALE.

### ANDREWS *et ux.* v. THE WYDALE.

### WALKER *et al.* v. SAME.

*(Circuit Court, E. D. Louisiana. February 13, 1889.)*

1. COLLISION—BETWEEN STEAMER AND TUG—FAILURE TO UNDERSTAND SIGNALS.
   A steam-ship ascending the left bank of the river in New Orleans, in the night, and about to cross, gave two blasts of the whistle on discovering a tug and tow, which were descending the middle of the stream, indicating that the steam-ship would pass to port, and starboarded its helm, and proceeded at half speed. The tug did not understand the course and motions of the steam-ship and responded with one whistle, indicating that it would pass to starboard, and ported its helm and the helm of the tow. The vessels approached, and the signals were repeated, and afterwards the tug again gave a single whistle. The tug then showed its red light, and the steam-ship gave the danger-signal, reversed its engines, and ordered full speed astern. The tug responded with the danger-signal, ordered the helm hard a-port, and put on all steam, but collided broadside with the bow of the steam-ship. *Held*, that each was in fault in not reversing its engines, and giving the danger-signal when they were 800 yards apart, as required in case of misunderstanding, by Rules & Reg. Gulf of Mexico, 1; that the tug was in fault in not reversing when the danger-signal was given, as required by rule 2; and that the steam-ship was in fault in entering the harbor under too great speed, and in persisting in going to the left, in violation of rule 1.

2. ADMIRALTY—JURISDICTION—DEATH BY WRONGFUL ACT.
   In the absence of a federal statute or statute of the state, where a collision occurs giving a lien on a vessel for damages for the death of a human being from negligence, an intervening libel *in rem* for damages for death resulting from such collision cannot be maintained.

In Admiralty. Libel for damages. On appeal from district court.
Libel by William M. Andrews and others against the steam-ship Wydale, and intervening libel by Walker & Fowler and others.

*W. S. Benedict* and *E. D. Craig*, for libelants and intervening libelants. *Frank N. Butler*, for claimant.

PARDEE, J. The libels and intervening libels are brought against the steam-ship Wydale for damages growing out of a collision between the tug Ivy, and barge in tow, and the steam-ship Wydale, on the night of the 26th of May, 1887, at between half past 8 and 9 o'clock. A great many witnesses have been examined on each side, including the witnesses on each of the colliding vessels, and a large number of witnesses who were ashore on each bank of the river, and the testimony, as usual, is very conflicting. After an attentive examination and careful consideration of the whole, I reach the following conclusions as to the facts in the case pertinent to the issues presented:

The steam-tug Ivy, with the barge Cossack in tow, cleared from her wharf in the upper part of the city of New Orleans for the port of Galveston. She swung out into the middle of the river, and was proceeding on her course, when about opposite the French market, in the city of New Orleans, she discovered a steam-ship ascending the river, showing a white mast-head light, and a red side-light. This steam-ship was the Wydale, which was coming up the river to the port of New Orleans, intending to make a landing in the upper part of the city. When discovered, the Wydale was near the left bank of the river, following the course of navigation, and about to cross over by Algiers point, in order to avoid the eddy in the bend of the river opposite the point. Both vessels carried the proper lights, and were properly manned and equipped. At about the time that the Ivy discovered the Wydale, the Wydale also discovered the tug, which was then showing the two mast-head lights, one above the other, indicating a tow, and the green, or starboard, light. As soon as the lights of the tug were seen on the Wydale, she gave two blasts of her whistle, indicating that she would pass to port, and starboarded her helm accordingly, and at the same time put her engines under half speed. The tug Ivy responded to the signal from the Wydale with one whistle, which would indicate that she would pass to starboard, ported her helm and the helm of the barge accordingly. The evidence is not satisfactory as to whether the pilot in charge of the Ivy understood that the Wydale had given one whistle or two whistles; the pilot insists that the signal was one whistle, and he is corroborated by witnesses afloat and ashore. After this exchange of signals, the vessels proceeded a short distance, approaching each other, when the Wydale again gave two signals of her whistle, and the tug replied with one whistle. There is evidence in the case that this signal was first given by the tug, and responded to by the ship, but it is not material which one at this time signalled first. Not liking the appearance which the vessels now presented, the tug again gave a single whistle, and by this time, or nearly, had swung around, so as to show her red light to the Wydale. Thereupon the Wydale gave the danger-signal of three short whistles, reversed her engines, and ordered full speed astern. The tug Ivy answered with the danger-signal, gave the order to put the helm hard a-port, and put

on all steam. These maneuvers brought the broad side of the Ivy directly in front of the steamer; almost immediately the tug went against the bow of the Wydale, whose headway had not been entirely checked. The tug was sunk, nearly all the crew escaping by way of the barge; a few, however, went into the river, all being picked up safely, except the son of one of the proprietors of the Ivy, who, in some way, fell between the barge and the tug, and was drowned. The Ivy and all the property aboard was a total loss. The barge Cossack, which was in tow of the Ivy, escaped with slight damages, and the loss of a hawser.

On these facts, I have no doubt that both vessels were in fault. Rules 1 and 2 of the rules and regulations for the government of pilots of steamers navigating the rivers flowing into the Gulf of Mexico, and their tributaries, are as follows:

"*Rule* 1. When steamers are approaching each other from opposite directions, the signals for passing shall be one blast of the steam-whistle to pass to the right, and two blasts of the steam-whistle to pass to the left. The pilot on the ascending steamer shall be the first to indicate the side on which he desires to pass; but, if the pilot on the descending steamer shall deem it dangerous to take the side indicated by the pilot of the ascending steamer, he shall at once indicate with his steam-whistle the side on which he desires to pass, and the pilot on the ascending steamer shall govern himself accordingly; the descending steamer being deemed to have the right of way. But in no case shall pilots on steamers attempt to pass each other until there has been a thorough understanding as to the side each steamer shall take. The signals for passing must be made, answered, and understood before the steamers have arrived at a distance of 800 yards of each other.

"*Rule* 2. If from any cause the signals for passing are not made at the proper time, as provided in rule 1, or should the signals be given and not promptly understood, from any cause whatever, and either boat become imperiled thereby, the pilot on either steamer may be the first to sound the alarm or danger-signal, which shall consist of three or more short blasts of the steam-whistle in quick succession. Whenever the danger-signal is given, the engines of both steamers must be stopped and backed until their headway has been fully checked; nor shall the engines of either steamer be again started until the steamers can safely pass each other."

It is apparent that from the first exchange of signals there was a misunderstanding on the part of the Ivy. It clearly appears from the testimony of the master and pilot that they did not understand the course and motions of the Wydale; it was a subject of remark between them at the time. It was then the duty of the tug, under the aforesaid pilot rules, to have given the danger-signal, and to have reversed its engines until signals could be exchanged and understood. It is clear that if the Ivy had reversed her engines, and given the danger-signal when her master and pilot first saw that her passing signals with the Wydale were misunderstood, there would have been no collision. The tug Ivy was also clearly in fault in not complying with the positive requirements of the said second rule by stopping her engines, and backing, when the danger-signals were given. Instead of so doing, she put on all steam, and went ahead. It may be that at that time the collision was so imminent that it would have resulted anyhow; but, even if this be so, it is

no excuse for the violation of the positive, peremptory rule, made by competent authority to govern such cases. It is apparent also that the Wydale was in fault. While the course she took was the proper and usual course to ascend the river to her landing-place, she was in fault for entering a crowded harbor under too great rate of speed, without due regard to the obstacles that might be in the way. See *The Southern Belle*, 18 How. 584; *The City of Paris*, 9 Wall. 634; *The Corsica*, Id. 630; *The Adriatic*, 107 U. S. 512, 2 Sup. Ct. Rep. 355; *The Syracuse*, 9 Wall. 672. The Wydale was also clearly in fault for disregarding the first pilot rule above quoted, under which the Wydale had no right, in disregard of the signals of the Ivy, to persist in going to the left; and under the second rule the Wydale was in fault in not stopping and reversing her engines, and giving the danger-signal, while the steamers were at least 800 yards apart, when it was apparent that the signals between the two vessels were misunderstood.

Both colliding vessels being in fault, the admiralty rule is that the damages must be divided between them. The damages in the case consist of the loss of the tug Ivy, the goods of the owner, the pilot, and some of the crew, and the damages to the barge. The Wydale suffered no damage, except that arising from delay, and makes no claim in the case. A great deal of evidence is in the record with regard to the value of the tug Ivy. The libelants claim $10,000. It appears that she was a vessel built for the government during the Rebellion, and was afterwards sold to private parties. She passed through various hands up to the time of her loss, at different prices, ranging from $5,000 to $10,000. She seems to have been in constant use, and to have received at times large and extensive repairs. In the district court the whole question of damages was referred to a master commissioner, who reported the value of the Ivy at the time of her loss to be $6,437.97. On exceptions to the commissioner's report, the district judge found that her value, under the evidence, was $5,850. There is a very strong argument made in this court that her value should not be assessed at over $4,000, on the ground that the last sale made of her was to one of the libelants at that rate. There is evidence, however, to show that there were peculiar conditions attending that sale, and that since that time some considerable repairs have been placed upon the vessel. Considering the whole of the evidence in this record, I am of the opinion that the district judge was correct in his determination of the value.

Other damages suffered by libelants and intervening libelants were referred to and reported by the commissioner, who allowed various amounts, and to his report there seems to be no well-founded objection, except in the case of Walker & Fowler, intervening libelants. With regard to the claim of Walker & Fowler, who have joined in the appeal to this court, the commissioner reported that they had suffered damages for towage, loss of hawser, and repairs in the sum of $163.40. Their claim, in addition to this amount, is for demurrage, 18 days, at $50 per day, making a sum of $900; damages for failure to deliver the cargo on time, $750; and costs of storing 272 tons of cargo, $190.40. The evi-

dence does not show that the barge was necessarily delayed any number of days on account of the collision. Of course, it was delayed some. Three days were sufficient time to make the little repair that was necessary, communicate with owners, and hire another tug; and for that time I find that the intervening libelants, as owners of the barge, are entitled to demurrage. The evidence seems to point to $50 per day as the proper demurrage, and, under the circumstances, that amount will be allowed. The other items of damage will be taken as reported by the commissioner, as no substantial dispute is made as to their correctness.

There remains only to be passed upon the claim of William M. Andrews and wife, father and mother of the boy drowned, who brought their intervening libel against the Wydale, claiming damages for the drowning of their son. So far as the facts are concerned, there is no question but what the drowning of this lad was one of the direct results of the collision; but an exception has been filed to the demand in this case, and, under the decision of the supreme court of the United States in case of The Harrisburg, the exception must be maintained. "In the absence of an act of congress, or a statute of a state, giving the right of action therefor, a suit in admiralty cannot be maintained in the courts of the United States to recover damages for the death of a human being on the high seas or on waters navigable from the sea, which is caused by negligence." See 119 U. S. 199, 7 Sup. Ct. Rep. 140. As there is no statute of the United States, nor of the state of Louisiana, within whose territorial limits the collision occurred, which gives a lien upon a vessel for damages on account of the death of a human being through negligence, the intervening libel ·in this case, which is a libel in rem, cannot be maintained.

The total damages, therefore, involved in this suit, are as follows: Value of the tug Ivy, $5,850; freight lost, $600; William M. Andrews lost personal effects, $200; Samuel Church lost personal effects, $145; Thomas Wood lost personal effects, $80; Walker & Fowler, damages to barge and demurrage, $310.40; making a total of $7,185.40; one-half of which—$3,592.70—should be paid by each vessel.

The accompanying decree will be entered in the case.