## THE VIRGINIAN.

### (District Court, W. D. Washington, S. D.    October 10, 1914.)

#### Nos. 1036, 1052.

1. COLLISION (§ 102*)—STEAM VESSELS MEETING—COMMON FAULTS.

The steamships Strathalbyn and Virginian, meeting nearly head on, came into collision at night in Puget Sound. The night was dark and cloudy, but there was no fog. When less than a mile apart, and about three minutes prior to the collision, the Strathalbyn signaled for passing port to port, and afterwards repeated the signal twice, and then blew an alarm signal. The passing signals were heard on the Virginian, but, being unable to see any lights or to make out the approaching vessel, they were not answered; but the engines of the Virginian were stopped on the first signal, and the alarm signal was answered by a signal that she was going full speed astern. The Strathalbyn had just left Tacoma with a cargo of lumber, and, her electric light apparatus being out of repair, had installed oil lamps. The testimony tended to show that she carried a masthead light and side-lights, but that they were not bright, and also that the side lights were obscured by rows of stanchions which were placed along the sides of the deck load. *Held*, that she was in fault for not having proper lights; that the Virginian, while not required to answer the passing signals, was in fault for not giving an alarm signal on hearing them, as required by article 18, rule 3, of the Inland Rules (Act June 7, 1897, c. 4, § 1, 30 Stat. 100 [Comp. St. 1913, § 7892]), which provides that such signal shall be given if either of two approaching vessels "fails to understand the course or intention of the other."

[Ed. Note.—For other cases, see Collision, Dec. Dig. § 102.*]

2. EVIDENCE (§ 586*)—NEGATIVE EVIDENCE—WEIGHT OF TESTIMONY.

On an issue as to whether or not a steamship, just prior to a collision at night, was showing proper lights, the testimony of those in charge of the navigation of meeting vessels, whose attention was necessarily called to the subject, though negative, is entitled to more weight than that of persons who had no special occasion to observe such lights.

[Ed. Note.—For other cases, see Evidence, Cent. Dig. §§ 2432-2435; Dec. Dig. § 586.*]

In Admiralty. Suit for collision by the Strathalbyn Steamship Company, Limited, as owner of the steamship Strathalbyn, against the steamship Virginian, American-Hawaiian Steamship Company, claimant, and cross-libelant; also suit by the same libelant as bailee of cargo against the same respondent, with the steamship Strathalbyn interpleaded. Cases consolidated. Decree against both vessels.

Huffer & Hayden, of Tacoma, Wash., for libelant.

Ballinger, Battle, Hulbert & Shorts, of Seattle, Wash., for Strathalbyn S. S. Co., Ltd.

Bogle, Graves, Merritt & Bogle, of Seattle, Wash., for respondent American-Hawaiian S. S. Co.

CUSHMAN, District Judge. On the night of January 12, 1912, between the hours of 7:30 and 8 o'clock, the British tramp steamer Strathalbyn, owned by the Strathalbyn Steamship Company, a corporation, and the American freight steamer Virginian, owned by the American-Hawaiian Steamship Company, were in collision on the waters of Puget Sound, at a point somewhere between Pully Point and Rob-

inson Point, as a result of which both vessels and a portion of the lumber cargo aboard the Strathalbyn sustained damage.

The above consolidated causes arise from the said collision, and were brought by the above parties for the purpose of recovering damages sustained as the result of said collision. The causes come before the court at this time upon the libel of the Strathalbyn Steamship Company, as owner of the steamship Strathalbyn, and the answer and cross-libel of the American-Hawaiian Steamship Company, as claimant and owner of the steamship Virginian, and the answer of the Strathalbyn Steamship Company, Limited, as owner and claimant of the steamship Strathalbyn, to the cross-libel of the American-Hawaiian Steamship Company.

Subsequent to the filing of the above-named libel, cross-libel, and answers, the Strathalbyn Steamship Company, Limited, as bailee of cargo aboard the steamship Strathalbyn at the time of the collision, filed its libel against the steamship Virginian on account of damage sustained by the said cargo, to which said libel the American-Hawaiian Steamship Company, as owner of the steamship Virginian, filed its answer and petitioned the court under Supreme Court admiralty rule 59, alleging that the said collision and consequent damage were caused solely by the fault of the steamship Strathalbyn, and asking that the said steamship Strathalbyn be seized to answer for the said damages, or that her owners be brought in as parties respondent to the said libel to answer for said damages, which petition was granted, and the Strathalbyn Steamship Company, Limited, as owner of the steamship Strathalbyn, filed its bond to answer for said damages, and filed its answer in the suit.

The parties hereto have stipulated that the consolidated causes should be submitted to this court for final determination upon the question of liability for the said collision, and should then be referred to a commissioner for the purpose of taking testimony as to damages, in accordance with this court's decision upon the question of liability.

As recovery is sought on behalf of each vessel for damage alleged to have been caused by the other, the facts must be determined without the usual aid from any rule as to the burden of proof.

Libelant contends the cause of collision was the fault of the Virginian in not keeping a proper lookout, and errors in navigation in not porting her helm when signaled to do so by the Strathalbyn, in not stopping and reversing her engines sooner, and in not giving a danger signal, if unable to see the lights of the Strathalbyn, after hearing the latter's passing signal.

The Virginian contends that the cause of collision was fault upon the part of the Strathalbyn, in that her lights were too dim to be seen, that her side lights were obstructed, so as not to be seen from ahead, that she had no range light, that she failed to stop and reverse her engines promptly upon receiving no answer from the Virginian to her passing signals.

A comprehensive statement or analysis of the mass of testimony taken will not be undertaken. The conclusion as to the effect of the testimony is deemed sufficient.

[1] The Strathalbyn was a tramp steamer 387 feet long, with a 52-foot beam, having a full cargo of lumber, bound from Tacoma for Sydney, Australia. The Virginian was a freight steamer 492 feet long, with a capacity of 12,000 tons, carrying about 2,000 tons, on her way to Tacoma from Seattle to finish loading.

The point of collision was not over a mile and a half southerly from Pully Point, off which point the Flyer overhauled, signaled, and passed the Virginian to starboard, keeping off about 200 yards. This signal was answered by the Virginian, both of which signals were heard by the Strathalbyn, then approaching the Flyer and Virginian, having passed Robinson Point and being on a course opposite to that of the Virginian. The Flyer was making 14 knots an hour, the Virginian 11, and the Strathalbyn 6, or a little more.

A few minutes after this passing of the Virginian, probably not over five minutes, the Strathalbyn blew one whistle to the Flyer, requesting a passing port to port; the Flyer and Strathalbyn being not more than a mile apart. The captain of the Flyer, seeing two white lights on her and concluding that they were range lights, accepted the signal, answering with one whistle. Both of these whistles were heard by those then navigating the Virginian, but they testify they saw no lights on the Strathalbyn.

When the Strathalbyn was on the bow, or abeam, of the Flyer, she blew one whistle to the Virginian, which then must have been considerably less than a mile away, as it would take the Flyer 20 minutes to get a mile ahead of the Virginian. It was 3 minutes or more from this first whistle to the Virginian until the collision occurred.

The pilot and third mate of the Virginian, on the bridge, and the lookout, properly stationed, heard this whistle. The pilot realized—as, under the circumstances, he could not well help—that the whistle was from ahead and intended for the Virginian. None of these men were able to see any light, or make out the approaching Strathalbyn. It is testified that the Virginian's pilot then signaled for the stopping of the engines, hearing which signal, the captain of the Virginian, then below, came on the bridge, and was immediately informed of the reason for stopping the engines. A second single blast of the whistle was then heard from the Strathalbyn ahead. Still no lights or vessel being seen by any of those watching from the Virginian, it is testified, the engines were reversed, and, a minute or over after reversing, a danger signal—four blasts—was heard from ahead. Still seeing nothing ahead, the captain of the Virginian gave three whistles to signify that his vessel was going full speed astern.

Within less than a minute, the boats came into collision, immediately prior to which the lookout and third officer on the Virginian saw a white light on the Strathalbyn. The Virginian immediately disengaged herself from the Strathalbyn, and, as they backed away, the port light of the Strathalbyn was seen aboard the Virginian. From the time of hearing the Strathalbyn's first whistle, those on the Virginian testify that her course was not changed, and that, not being able to make out the Strathalbyn or her lights, her whistles were not answered.

Those in charge of the navigation of the Strathalbyn testify that,

when the Strathalbyn gave her first signal, a single blast, to the Virginian, the red and green lights of the Virginian were plainly visible, indicating that she was coming directly head on; that, as this signal was given, the helm of the Strathalbyn was ported a point or more; that, after waiting a minute and receiving no answer from the Virginian, her red and green lights being still visible, another single blast was blown, the helm again ported, and the engine stopped; that, as this signal was given, the red light of the Virginian began to shut out and her green light to open, indicating that, instead of going to starboard, as signaled, she was directed across the Strathalbyn's bow; that, after waiting a minute, the Virginian not answering and her red light still being hidden, the Strathalbyn blew another single blast, and a minute and a half later reversed her engines. The Virginian still coming on, giving no signal, no change in her course being observable, and collision being imminent, the Strathalbyn gave the danger signal, which was immediately answered by three whistles from the Virginian.

In spite of a discrepancy in the testimony as to the number of passing signals blown by the Strathalbyn before the danger signal—two, as testified on behalf of the Virginian, and three, as averred by those on the Strathalbyn—it is clear that three were given.

The faults alleged as to the lights of the Strathalbyn will be first considered, as first in point of time, and so affecting that which followed. The night was dark and cloudy, a good night for seeing lights. The wind was southerly, an advantage to the Virginian in hearing the whistles of the Strathalbyn. There was, at the place of the collision, plenty of room for, and no embarrassing element to, the navigation of either vessel, other than that produced by the conduct of the other.

The Strathalbyn was equipped with electric signal lights, but several days before she was ready for sea the dynamo was found out of commission and was not repaired prior to her departure. She was supplied with standard oil lamps and oil. The lamps were new two years before, when brought aboard, but there had never been occasion before to use them. The oil had been secured six months before. Several hours before leaving Tacoma, Quartermaster Taylor, as he testifies, carefully prepared and tested these lamps, put in new wicks and oil fresh from the tank, lighted them, and trimmed the wicks. This witness' testimony, if true, could have been corroborated in certain particulars, where it has not been done.

Prior to reaching the point of collision, the Strathalbyn met and passed, on her starboard, near Brown's Point, the steamers Indianapolis and Daring. The Indianapolis later overtook and passed to starboard of the Strathalbyn at Robinson Point, a few minutes before the collision. The Strathalbyn met and passed port to port the steamer Flyer immediately before the collision. After the collision, the Salmora, a 30-ton gasoline tug, passed between the Virginian and Strathalbyn—about 150 yards away from the Strathalbyn and a little nearer the Virginian.

The effect of the evidence of those in charge of the navigation of the different vessels passing the Strathalbyn on the night in question is that her lights were not ordinarily bright, that they had difficulty

in seeing them, that they were not visible as far as they should have been, and that the lights could not be seen from points ahead where they should have been. The stern light upon the Strathalbyn went out before Robinson Point was reached. The starboard side light was trimmed and relit immediately after the collision—whether finding it to be out or very dim was the occasion is not clear from the testimony. The masthead light was taken down after the collision and examined. When it was again raised, the cap on the top of the lamp was left up to give ventilation. It is not clear whether it was not closed when it was taken down for examination.

The officers of the Strathalbyn appear to have looked at the lights often during and before the signaling to the Virginian. While vigilance in this regard is to be expected of men experienced in navigation, there appears to have been overanxiety on this night about the lights, which tends to show that it was realized that they were not satisfactory. A circumstance occurring an hour or more before the collision, when the Strathalbyn, near Brown's Point, met the Daring, probably called the attention of those on the Strathalbyn to the condition of the lights. The mate on the Daring, who was at the wheel, testifies:

"A. Well, first I heard two whistles, and then the next was I discovered a dark object ahead, and about that time the captain stepped out from his room and asked why I didn't answer the two whistles. [Interrupted.] Q. Did you answer the two whistles? A. Eventually; yes, sir. Q. Did you at the time when you first heard them? A. No, sir. Q. Why didn't you? A. Because I didn't recognize where they came from. * * * Q. Could you see the vessel that gave these whistles? A. Well, I will have to say no, under the circumstances, without explaining. Q. What was the first thing that you did see of the vessel, and whereabouts did you see her, if you saw her? A. Well, she was pointed out, and at about the same time it was apparent to me that the dark object was opening out lights, and I was convinced, then, that it was a vessel. Q. Did you see any lights on her? A. I saw two. Q. Where were they, and what kind of lights? A. They proved to be on the forward part of the vessel, white lights; and about the time I answered, or eventually answered, the two whistles, the one light—lower light—disappeared, and I concluded it was a lantern over the side where they had been clearing their anchors, or something of that kind."

The failure of the Daring to promptly answer the signal of the Strathalbyn, probably, suggested to the latter's officers a defect in her lights. The regular electric side lights of the Strathalbyn were placed on the upper bridge. The oil lights, being used upon the night of the collision, were not in the screens upon the upper bridge, but in those on the lower bridge, or chart room deck, which was 15 feet 4 inches above the cargo deck below. No defect has been shown in those screens, which were 8 inches above the chart room deck.

The cargo forward on the deck below was piled about 14 feet high —that is, approximately as high as the lower bridge—so that men moving about could step from the top of the lumber upon the lower bridge. This lumber was laid, or piled, lengthwise of the ship between stanchions placed on end, or standing up inside and against the rail on either side of the deck forward. The stanchions extended some distance above the lumber piled between them, some being as

high as 20 feet above the deck. All of the stanchions extended higher than the lights, and would obscure them from ahead, if not kept inboard from the blocks in the front of each light screen, placed there to keep the lights from shining across the bow. Inland Rules, art. 2 (d), 2 Fed. Stat. Ann. 174, 30 Stat. 97 (Comp. St. 1913, § 7876).

These stanchions were about 7 in number, upon either side, placed at irregular distances apart, the average being about 12 feet. They were 6 by 10 inches each, according to the testimony for the Strathalbyn, placed with the broad face to the rail, though it is shown to be usual to place the narrow face to the rail for greater strength in holding the cargo.

The outboard side of the blocks in the front end of the light screens were 47 feet 7 inches apart. The lights in the screens, back of the blocks, were the same distance apart. The first stanchion upon the port side was about 8 feet forward of the front of the lower bridge. At this point, from the inside of the bulb, or top of the rail on the port side, to a like point on the starboard side, was 48 feet 7 (or 7½) inches, about 6½ inches further outboard on each side than the side lights. It therefore follows that, unless this first stanchion on the port side leaned inboard at least 6½ or 7 inches at a point level with the lamps used, it would obstruct this light forward.

Much testimony has been taken as to the position, in this respect, of this and the stanchions forward of it, prior to and after the collision, as well as that of like stanchions used with later cargoes on the same ship, together with the question of whether such stanchions generally tend outboard or otherwise. The height of the rail above the deck, against which the stanchions were placed, was about 4 feet. The lumber cargo, therefore, extended 10 feet above the rail between the stanchions. The stanchions, after the cargo was on, were drawn together by lines passing across the deck over the lumber, the winch being used to draw them up.

Under these circumstances, it is reasonable to conclude that the stanchions would lean outward slightly. By the force of gravity, as the loading progressed, the tendency would be for the lumber to spread and shuffle outward, and all the effect of this would not be overcome by drawing the stanchions inboard afterwards. Such result with poles or lumber on railroad cars, or cordwood upon a wagon, between stanchions, are matters of common observation.

In one slight particular there was a difference between the stanchions on either side. Upon the port side, underneath and on the inside of the rail top, running lengthwise of the rail, was an iron pipe, which extended an inch further inboard than the innermost part of the rail top. To protect this pipe, an inch piece of board was placed between the stanchions and the rail. While this might tend to lessen, to a slight degree, the obstruction to the light shining forward, by the stanchions on the port side over the starboard, it would not cure it. The pilot of the Strathalbyn testified to seeing the port light shining on the stanchions, as follows:

"Q. Did you observe the rays of the red light upon the stanchions? A. Indeed, sir; several times. Q. State how they appeared. A. They ranged right

forward, and touched three or four stanchions, I noticed. Q. On what side? A. Port side; the red light. Q. I mean inside or outside the stanchions? A. The outside stanchions, sir. Q. It showed full on the first stanchion, did it? A. Yes, sir. Q. And ranged along so that you could see— A. I could see the reflection of the light on three or four stanchions. Q. Ahead of the first stanchion? A. Yes; back to the foremast rigging."

The captain of the Strathalbyn testifies to seeing the light shining on the stanchions:

"Q. Did you observe the rays of light upon these stanchions? A. Yes; I did. Q. How did it appear? A. They would shine on the outside of the stanchions."

As also does the first mate:

"Q. Did you notice whether or not the red rays of the port light shone on the outside of any of these stanchions forward of the light? A. I could see the reflection on both sides, the green and red one, on the after stanchions. Q. Did you notice it ahead on any other stanchions, ahead of the after stanchions? A. No; I don't think I saw it on any of the rest of them. I don't think so."

The condition described could only result in hiding the light from ahead. The only question would be the extent, or zone over which it would be hidden.

[2] Much testimony has been introduced on libelant's part to show that the lights of the Strathalbyn were bright and visible from ahead; but it is overborne by that which has been indicated. Passengers upon the Flyer were among the witnesses of libelant. While they were doubtless as honest and disinterested as the witnesses for the Virginian, those on the Flyer, Indianapolis, Daring and Salmora, actually engaged in navigating them with reference to the Strathalbyn, as witnesses, while possessing the advantage of having as great or better opportunity, knowledge, skill, and lack of interest in making these observations of the Strathalbyn and her lights, as had libelant's witnesses, also had an added advantage in the necessity and incentive, in navigating their respective vessels, with reference to the Strathalbyn, to observe her and her lights closely.

This one advantage on their part, though they gave negative testimony—that they did not see the lights upon the Strathalbyn, or see them as soon as they should have been seen—more than compensates for the advantage of those witnesses who had no particular reason to observe, who testify that they recall seeing the lights in question. This does not apply to a number of witnesses for libelant, who, after word had reached Tacoma of the collision, set out in a small boat to meet the Strathalbyn upon her return to Tacoma. They testify that, as the Strathalbyn came towards them, they could see both of her side lights at the same time. Owing to the evident interest of these witnesses, the inconsistencies in their testimony and the fact that their observations were made several hours after the collision, their evidence is considered of less value than that of those navigating the other boats.

The Virginian, by not answering the passing signals of the Strathalbyn, and the Daring, by not promptly answering her signal, acted in accordance with what those navigating the Virginian and Daring now testify was the condition of the Strathalbyn at that time, in not hav-

ing lights that could be seen. These facts give added force to their testimony. The Amboy (D. C.) 22 Fed. 555; The Westfield (D. C.) 38 Fed. 366; The General (D. C.) 82 Fed. 830; The Pierre Corneille (D. C.) 133 Fed. 604.

In a sense the same may be said of the Indianapolis, for her captain and quartermaster say that, having passed the Flyer and Virginian a few minutes before the collision, and having noted the poor condition of the Strathalbyn's lights upon the two occasions of meeting and overhauling her, the captain of the Indianapolis was apprehensive that there might be trouble in the Virginian and Flyer meeting the Strathalbyn, and, for that reason, he did not change his course immediately upon passing Pully Point as usual—which would have shut off his view of all these vessels, but kept on his course for a time watching them.

The greater value of the testimony regarding the lights on the Strathalbyn of those navigating the Flyer over that of her passengers would be greatly lessened as the Strathalbyn drew abeam and passed the Flyer, for, as soon as the Flyer was well clear of the Strathalbyn, the motive of the former's officers to closely observe the Strathalbyn would have ceased, and their attention be concentrated along the course of their vessel, while the passengers, without such responsibility, might then well observe the Strathalbyn and her lights more closely than the officers of the boat. It is therefore probable that these passengers did observe the port light of the Strathalbyn when she was abeam the Flyer, though the officers did not.

None of libelant's witnesses is more positive in testifying that both side lights were visible from a point ahead than Strand, a man taking care of the boats at the Tacoma Yacht Club, who testifies that, after putting the lights out on the yachts, he went ashore to the wharf, where he met a longshoreman, to whom he talked as he looked out over the Sound. His testimony regarding the lights on the Strathalbyn, as she lay at anchor shortly before going to sea, is as follows:

"A. And I seen both side lights at the same time. Boat was swinging once in a while, and mostly I seen the green light, and they appeared to me to be ordinary good side lights. Q. How did the masthead light appear to you? A. Just as good as the rest of them—side lights. Q. How far away would you say the Strathalbyn was from the Commercial bridge where you were standing? A. Oh, about a little bit more probably than a quarter of a mile. * * * Q. Now, captain, will you describe how the vessel was swinging, if she was swinging at all? Just describe that. A. Yes; she was swinging more or less, just as the wind appeared; sometimes a little bit stronger, you see, and sometimes dying down again. Q. And her bow was pointing which way? A. Her bow was pointing directly on the place where I was standing, most of the time. Q. How would you say the side lights appeared to be burning, compared with the ordinary lights of vessels? A. I could not see any difference from an ordinary good light—good side lights and her side lights. Q. And the same question with respect to her masthead light? A. Yes. Yes, sir; all the lights. Q. How long were you standing on the Commercial Street bridge observing these lights and the vessel? A. I was standing there for about a half an hour. Q. And how did it happen you were standing there for a half an hour? A. I was talking with a longshoreman and looking at the boats passing around there, and looking after the yachts, because it was blowing more or less, and that is why I happened to stay there and watch the harbor. Q. Did you see these lights more than once while you were standing there? A. Oh, yes; on and off, all the time."

The side lights are running lights, and only in place when the vessel is under way. Taylor, the quartermaster on the Strathalbyn, who had charge of and placed the lights in the screens, testifies:

"Q. What time did you light them? A. I had finished my tea, and they sang out, 'Lights out!' and they started to heave away the anchor. Q. Who told you to light the lights when they started out? * * * A. It was my place. Q. Is that your regular duty on the ship? A. It was that day. Q. Did anybody order you that evening to light the lights, and, if so, who was it? A. I heard the order come down from the deck, 'Lights out!' and it was my place to light them, and I went and lit them."

Mr. Strand was doubtless mistaken. A number of the crew of the Strathalbyn, in the forecastle at the time of the collision, who clambered back over the lumber along the port side, testified to seeing the Strathalbyn's port light. Some of them say they saw it inside, some outside, of the stanchions, and some are not clear how they saw it. The collision left the Strathalbyn with a bad list to starboard, taking her starboard side light nearly to the water. If any of the crew saw the port light inside the stanchions, there must have been a very considerable obstruction to the light forward and off the port bow.

Considering that the ship narrowed forward of the bridge from about 48 feet to about 44 feet (or 4 feet) in a distance of 80 feet, there would be 2 feet narrowing upon the port side; that seven stanchions were arranged in this distance along the rail, each exposing a 6-inch surface, a total exposed surface of $3\frac{1}{2}$ feet, it is clear that, from any point forward of the stanchions, there would be such an overlapping of stanchions as to prevent a man seeing the side light between the stanchions. It is probable, on account of the list of the vessel to starboard, that, as the men came along the port stanchions, got near the light, and straightened upright between the last stanchions, all of which would be canted with the ship to starboard, they were able to look down over the outside of the last stanchion into the port light screen, the inside board of which would be also canted to starboard. This is to be inferred from the testimony of these witnesses.

One of the crew testifies that, after the collision, his knee was hurt, and he crawled on his hands and knees to the port side; then crawled along, leaning on the railing, walking along stanchion by stanchion, dragging himself along as best he could; after he got to the port side he stood up and went aft; that he saw the port light when he was going aft on the port side; that he could look straight back at it, and that he was about 10 feet in front of it when he first saw it. Another testifies that he did not see the port light until he got up on the port side. The vessel was heeling over, and he made for the high side of the boat. He did not look over the stanchions to see the side light. He could see through the stanchions and see the port light, because the stanchions were far apart. He saw the side light as soon as he came up on the port side. He walked up to the port side at right angles from where he came out. He was more than 15 or 20 feet from the light when he first saw it, and was standing inside the stanchions when he saw it. A third testifies "she [the Strathalbyn] had listed over all the time, * * *" and that, after the collision "she had listed bad

enough that I had to hold to those scantlings (stanchions) that was keeping the cargo tight, catch hold and walk around the port side."

On behalf of the Strathalbyn, it is contended that, even if it were conceded that the port light was, to some extent, obscured ahead, yet the angle of approach of the Virginian was so great that the light should have been seen, notwithstanding it was hidden from ahead. It is clear that the vessels, on opposite courses, came into practically a head-on collision. Probably the courses were not over a point off of being directly opposite. This conclusion is at variance with much testimony as to the repeated porting of the helm of the Strathalbyn, the change in the Virginian's course to port, and other testimony, expert and otherwise; but all of this is overborne by the evidence of contact left upon the vessels after the collision.

The Strathalbyn, at the time of the collision, had a six degree list to starboard. The Virginian had no list. The stem of the Virginian struck across the stem of the Strathalbyn at the 29-foot mark. Above that point, the stem of the Virginian entered the port bow of the Strathalbyn. Below that point, the stem did not enter the hull of the Strathalbyn; but the starboard bow of the Virginian moved, in contact, aft along the starboard bow of the Strathalbyn, the forefoot of each vessel passing by that of the other.

The lower structure of the Strathalbyn being stronger than the upper and able to fend off to starboard the Virginian, whose stem and bow remained rigid throughout, the stem of the Virginian above the 29-foot mark, as it entered the upper part of the Strathalbyn, instead of following a prolongation of the line of approach and contact, was deflected through to the starboard bow of the Strathalbyn, along a line corresponding to that of the latter's starboard bow, below the 29-foot mark. The stem of each vessel is practically perpendicular fore and aft—that is, with no overhang forward—so that there could have been no contact with the Strathalbyn's port bow above the 29-foot mark before that had with the starboard bow below. It is therefore concluded that the side lights of the Strathalbyn were hidden to the Virginian as she approached, and that this was a proximate cause of the collision. It is not clear whether, but for the obstruction, they could have been seen in time to prevent the collision.

It is contended upon the part of the Strathalbyn that, conceding her side lights were hidden from ahead, still the Virginian should have seen the masthead light of the Strathalbyn in time to answer her passing signal and avoid a collision. The failure on the Strathalbyn's part to properly position satisfactory side lights cannot be so excused. The failure of those on the Virginian to see the masthead light of the Strathalbyn, it is contended, is evidence of want of a proper lookout—enough of itself to explain the failure to see the port side light.

It is true the captain of the Flyer made out two white lights on the Strathalbyn, which he concluded were her range lights. One of those was probably her masthead light; but, as she had no aft range light, the other was probably a lantern forward about the forecastle. If it had been a port, hole light, necessarily on the port side, what the captain took for the range lights would not have opened so as

to satisfy him with a passage port to port. This lantern upon the deck would probably be hidden to the Virginian, then directly ahead, by the rise forward of the rail of the Strathalbyn, as the vessels were approaching head on, the masthead light would appear stationary, and, under the circumstances, a failure to distinguish it from shore lights upon Vashon Island will not be held a fault.

In the case of The Oregon, 158 U. S. 186, 15 Sup. Ct. 804, 39 L. Ed. 943, the court found the failure on the part of the Oregon to recognize the Clan Mackenzie's anchor light to be a fault, but further found the government light, with which it was claimed the anchor light was confused, to have been plainly visible, and that it should have been seen, thus preventing any confusion.

Having reached this conclusion, the questions of whether the Strathalbyn should have carried an aft range light, or whether there was other fault in her navigation, will not be considered.

The question of fault upon the part of the Virginian remains to be considered. The collision did not occur for three or four minutes after the first whistle of the Strathalbyn to the Virginian, during which time the Strathalbyn blew two passing and a danger signal. On account of the general route of vessels at the point of collision, the signals exchanged between the Strathalbyn and the Flyer, indicating a passage port to port, and the signals given to the Virginian by the Strathalbyn, the Virginian must have known, approximately, the general position and course of the Strathalbyn, and when those aboard her could not make out the Strathalbyn or see her lights, they should have reversed her engines not later than the second whistle. That she did so is testified to by witnesses for the Virginian with some detail.

The bell book in the engine room of the Virginian contains the following entries:

| | Starboard | | Port |
|---|---|---|---|
| O | 7:57 | O | 7:57 |
| MM | .58 | MM | .58 |
| O | .59 | O | .59 |
| V | 8:09 | V | 8:09 |

Indicating: (O) "stop," 7:57; (MM) "full speed astern," 7:58; (O) "stop" (reversing), 7:59; (V) "slow ahead," 8:09.

The engine room log book of the Virginian contains the following:

"Stop, 7:57; full astern, 7:58, stop, 7:59, ahead slow, 8:09. In collision with S. S. Strathalbyn at 7:58 p. m."

Article 28 of the Inland Water Rules provides:

"When vessels are in sight of one another a steam vessel under way whose engines are going at full speed astern shall indicate that fact by three short blasts on the whistle." 30 Stat. 102 (Comp. St. 1913, § 7902).

The three whistles of the Virginian were not given until after the Strathalbyn's danger signal, less than a minute before the collision. Captain Beecher, pilot of the Strathalbyn, testifies:

"Q. When the Virginian and Strathalbyn came into collision, did you notice whether or not the Virginian was backing? A. When he blew his three whistles in answer to my danger signal, I looked along the hull which was

very plain, and I called attention that she was just beginning to back; the backwater was just getting back under his starboard quarter."

Captain Crerar of the Strathalbyn also testifies:

"Q. Did you observe whether or not the Virginian was backing at the time you came into collision? A. Just before she struck us, Captain Beecher directed my attention to the wash of her water coming up. Q. Where did that appear to be? A. Around her stern. Q. How far forward? A. It did not get forward at all, but was just beginning to come up. Captain Beecher remarked, 'He is just going astern now.'"

It is therefore concluded that the engines of the Virginian were not reversed until less than a minute before the collision, and that she was clearly in fault for not reversing her engines sooner.

Rule 1, article 18, of the Regulations for Inland Waters for steam craft, provides for passing signals for vessels approaching nearly head on. Rule 3 of this article provides:

"If, when steam vessels are approaching each other, either vessel *fails to understand the course or intention* of the other, from any cause, the vessel so in doubt shall immediately signify the same by giving several short and rapid blasts, not less than four, of the steam whistle." 30 Stat. 100, 2 Fed. Stat. Ann. 179.

Rule 5 makes provision for signals by vessels nearing river or channel bends, where approaching vessels from the opposite direction cannot be seen, and for signals by vessels moving from their docks, when other boats are liable to be moving towards them. Rule 8 provides for the signals to be used when vessels are running in the same direction and the rear one desires to pass the one ahead. Rule 9 provides:

"The whistle signals provided in the rules under this article, for steam vessels meeting, passing, or overtaking, are never to be used except when steamers are in sight of each other, and *the course and position of each can be determined* in the daytime by a sight of the vessel itself, or by night by seeing its signal lights. In fog, mist, falling snow or heavy rainstorms, when vessels cannot so see each other, fog signals only must be given." 30 Stat. 101, 2 Fed. Stat. Ann. 179.

Article 28, set out above, provides for a signal where a steam vessel is going full speed astern and is in sight of another vessel.

Rule 3 of the Pilot Rules of July 25, 1911, made pursuant to article 30, c. 802, Act Aug. 19, 1890, 26 Stat. 328 (Comp. St. 1913, § 7869), provides:

"The signals for passing, by the blowing of the whistle, shall be given and answered by pilots, in compliance with these rules, not only when meeting head and head, or nearly so, but at all times. When the steam vessels are in sight of each other when passing or meeting at a distance within half a mile of each other, and whether passing to the starboard or port. The whistle signals provided in the rules for steam vessels meeting, passing, or overtaking are never to be used except when steamers are in sight of each other and the course and position of each can be determined in the daytime by a sight of the vessel itself or by night by seeing its signal lights. In fog, mist, storms, when vessels cannot so see each other, fog signals only must be given."

Under these rules, it is the contention of the Virginian that she was excused from giving the danger signal required by rule 3, article 18, because she could neither see the Strathalbyn or her lights, and that,

under such conditions, rule 9 forbids the giving of any whistle signal; that, by her silence, the Virginian signaled that the Strathalbyn and her lights could not be seen.

By rule 3, the danger signal is required when "from any cause" either approaching vessel "fails to understand the *course or intention* of the other." Rule 9 forbids whistle signals, unless "the *course and position* of each [vessel] can be determined," by seeing the vessel in the daytime, or its lights by night. (The italics are the court's.) It is shown that those navigating the Virginian knew a vessel was "approaching" from ahead; that they knew the vessel's "intention," from her whistle, was to pass the Virginian port to port, but, not being able to either see the "approaching" vessel or her lights, they could not understand her "course." It was, therefore, the duty of the Virginian "immediately," and certainly not later than the second whistle of the Strathalbyn, to give the danger signal, as required by rule 3.

Article 28 positively directs three whistles by a steam vessel under way whose engines are going full speed astern, when the vessels are in sight of each other. ' It does not forbid such signals under all circumstances, unless the vessels are in sight of each other. Rule 9, forbidding the use of signal whistles provided in the rules under article 18, is limited to those signals provided for "steam vessels meeting, passing or overtaking." This quoted expression—if standing alone— it might plausibly be argued contemplates and includes any situation in which vessels are approaching each other; but an examination of the other rules of article 18 shows clearly that its application is not so broad.

Rule 1 covers steam vessels "approaching each other head and head," in which case they shall pass port to port, and the proper signal may be given by either for such passing; "but, if the courses are so far on the starboard of each other as not to be considered as *meeting* head and head," each shall pass on the starboard of the other, and either may give the signal therefor. Rule 8 provides for the passing of vessels running in the same direction, and provides for the signals for passage of the vessel astern to port and starboard of the vessel ahead. In this rule the following expressions are used:

"The vessel which is astern shall desire to *pass* on the right, * * * or if she shall desire to *pass* on the left, * * * or if the vessel ahead does not think it safe for the vessel astern * * * to *pass*, * * * and under no circumstances shall the vessel astern attempt to *pass*" the other.

The word "overtake" or "overtaking" is not used in rule 8; but when the word "passing" is used in rule 9, which rule is only applicable to "steam vessels meeting, passing or overtaking"—it, being separated from the context of rule 8, becomes too vague, and therefore it is clear that the word "overtaking" was added as a synonym, or explanatory of the sense in which the word "passing" was used.

The signals forbidden by rule 9 are clearly those provided for in rules 3 and 8 only. It is not meant to decide that the duty to give the special danger signal provided for in rule 8, where the vessel ahead does not think it safe for the vessel astern to attempt to pass, depends upon whether the course and position of each can be determined

by seeing the other or her lights. If the prohibition of rule 9 extends to the danger signal, provided for by rule 3, then the danger signal could never be used, except when the vessels were in sight of each other and the *"course and position* of each could be determined," while rule 3 makes the failure to understand the "course" of the other vessel a prerequisite to using the danger signal. If the construction of rule 9 contended for was adopted, no room would be left for the operation of rule 3, which depends upon the failure to "understand the course and intention of the other" vessel, while rule 9 forbids signals, except when the *course and position* of each can be determined.

Doubtless, the inability of competent and vigilant men on the lookout on the Virginian to make out either the Strathalbyn or her lights excused the Virginian for not accepting and answering the port to port passing signal of the Strathalbyn, provided for by rule 1; but it did not relieve her of the duty of "immediately"—being unable to understand the course of the Strathalbyn—sounding the danger signal and reversing. If this signal had been given promptly, the Strathalbyn would, doubtless, have reversed her engine a minute or two sooner, and the collision have been averted.

It is concluded that the Virginian was clearly in fault for failure to give the danger signal. It is therefore unnecessary to consider further the question of other faults charged against the Virginian. The New York, 175 U. S. 187, 20 Sup. Ct. 67, 44 L. Ed. 126; Duluth S. S. Co. v. Pittsburg S. S. Co., 180 Fed. 656, 103 C. C. A. 622.

Both vessels are therefore found to be at fault, and the damage will therefore be divided.