**THE TRIM.**
**THE EXETER.**
Nos. 675, 723.

District Court, D. Massachusetts.

Nov. 24, 1939.

In case No. 675:

Burnham, Bingham, Pillsbury, Dana & Gould, of Boston, Mass., for libelant.

Thomas H. Walsh, of Boston, Mass., for claimant.

284

In case No. 723:

Thomas H. Walsh, of Boston, Mass., for libelant.

Burnham, Bingham, Pillsbury, Dana & Gould and Whiting Willauer, all of Boston, Mass., for claimant and respondents.

BREWSTER, District Judge.

The above libel by the General Seafoods Corporation (Admiralty No. 675) and the cross-libel by the J. S. Packard Dredging Company (Admiralty No. 723) were heard together and may conveniently be disposed of in one opinion.

The controversy grows out of a collision between the trawler Exeter and the tug Trim and Scow No. 19.

The collision occurred in the channel of Boston Harbor, nearly abreast Castle Island. The channel in that vicinity was 1200 ft. wide. The southern half was then being dredged, but it was not closed to navigation. The Trim was engaged in towing scows operating in connection with the dredge Belver which was anchored somewhat to the east of Castle Island near the center line of the channel in the southerly half.

On the morning of June 3, 1936, shortly after midnight, the Trim picked up Scow No. 19, which had been loaded, and which had just previously been set adrift from the dredge, and was intending to proceed inbound to Governor's Island. The scow was fastened to the tug on the latter's starboard side. It was lashed near the after part of the scow, so that the scow extended about 100 ft. ahead of the tug. The Trim and scow backed across the northerly 600 ft. half of the channel, then straightened up on her course and proceeded at the rate of one mile per hour along her starboard side of the channel close to the line of buoys which marked the northerly line of the channel. The tug was fully equipped with lights, including the regulation white towing light, and all agreed that they were burning brightly. There were also two lights on the scow. These lights were kerosene lanterns hanging from a crane 7 or 8 ft. long, placed in the middle of the coaming, on both ends of the scow. There was testimony by those on the Exeter that the lantern of the forward end was not burning brightly, but I find that no fault in this respect can be ascribed to the Trim.

The Trim was manned by a captain, deck-hand and engineer and a scow-man was on the scow. The captain was at the wheel in the pilot-house, and the deck-man was on deck in front of the pilot-house.

The Exeter was a fishing trawler. It left the Boston Fish Pier soon after midnight on the morning of June 3, 1936, bound outward to sea. It turned the buoy off the pier and proceeded down the channel. The mate was at the wheel and was steering by compass. He testified that his first course was south-east ½ S. until it was changed to south-east ¾ S. when he was off the Army Base. There was no lookout placed at the bow, but the master was at the window in the pilot-house.

The evidence as to the course which the Exeter followed in going down the channel is conflicting, but I find that she failed to follow a course down her starboard side of the channel; on the contrary, she was taking a zigzag course, finally coming over on her port side of the channel about 75 ft. from the northerly line and was undertaking to pass the Trim starboard to starboard without giving any signal to communicate such intention. In fact, the witnesses for the Exeter all agree that they gave no signal of any kind at any time.

The speed of the Exeter, as she proceeded down the channel, was six knots an hour, and that speed was not reduced nor the engine stopped until the collision. The force of the impact stopped the engine.

The captain of the Exeter saw the lights on the Trim, including the white lights, shortly after she left the pier, about two miles away. No one on the Exeter seems to have seen the light on the scow until shortly before the accident, but I find that if those in charge of navigating the Exeter had been duly diligent, they would have had no difficulty in seeing this light in time to avoid the collision. Those on the Trim saw the lights of the Exeter shortly before she reached the Army Base. They saw at different times the red and the green lights, and it is not disputed that at some time before the collision the Trim gave a single blast signal, indicating an intention to pass port to port, to which the Exeter made no reply.

The witnesses do not agree upon the distances between the boats when this port to port signal was given. Those testifying in behalf of the Exeter put the distance at 250 ft. and the crew of the Trim at half a mile.

Upon this disputed issue, I find that the signal was given sufficiently early to have enabled the Exeter to have complied and passed port to port. Instead, the mate failed to respond either by signal or by change of course.

The witnesses for the Trim also testified that a danger signal was given when the boats were about 200 ft. apart. This is denied by those in charge of the Exeter. I find that such a signal was blown and that the order for full speed astern was given immediately thereafter, but too late to permit of any manoeuvering that would avoid a collision in spite of the efforts of the Trim in turning her wheel to port.

The Exeter struck the scow on the forward end of the starboard side, and both the trawler and the scow were pushed over into shallow water and both sank in a few minutes after the impact.

The weather was fair, the water smooth and tide ebb. The captain of the Trim, when he noticed the zigzag course the Exeter was following, expressed his uncertainty as to what the Exeter was going to do; but he gave no danger signal until a few minutes, and made no attempt to stop until a few seconds, before the collision when the Exeter was so close to the scow that the collision was inevitable.

■ I have no difficulty in concluding that the Exeter was at fault in several respects. She failed to keep to the starboard side of the channel, which is a narrow channel within the purview of Inland Rules, Art. 25, 33 U.S.C.A. § 210. She failed to pass the Trim port to port when nothing prevented her from doing so, thus violating the Passing Rules, Art. 18, Rule I, 33 U.S.C.A. § 203. She failed to indicate by signals an intention to pass starboard to starboard. She gave no danger signal, as required by Inland Rules, Art. 18, Rule III, 33 U.S.C.A. § 203, and in addition took no steps to reduce her speed up to the very moment of the collision. She also was at fault in not having a competent lookout on duty, as required by the Inland Rules, Art. 29, 33 U.S.C.A. § 221.

■ There is no doubt that the Exeter proceeded down the narrow channel without regard for the rules governing navigation, and without giving due consideration to the safety of the approaching vessels. The faults with which the Exeter can be charged are so gross that the Court is warranted in invoking the long-established rule

that when one of the vessels is grossly at fault, any doubt regarding the management of the other vessel, or the contribution of her fault, if any, to the collision should be resolved in her favor. The City of New York, 147 U.S. 72, 13 S.Ct. 211, 37 L.Ed. 84, 85; Ludvig Holberg, 157 U.S. 60, 15 S.Ct. 477, 39 L.Ed. 620; The Umbria, 166 U.S. 404, 17 S.Ct. 610, 41 L.Ed. 1053; The Victory, 168 U.S. 410, 18 S.Ct. 149, 42 L.Ed. 519; The San Simeon, 2 Cir., 63 F.2d 798.

■ This rule imposes a heavy burden to show that a failure on the part of the Trim contributed to the collision. The only ground upon which it could reasonably be urged that the navigators of the Trim failed in their duties was that they did not seasonably give the danger signal.

Rule III of Article 18 of Inland Rules, 33 U.S.C.A. § 203, provides: "If, when steam vessels are approaching each other, either vessel fails to understand the course or intention of the other, from any cause, the vessel so in doubt shall immediately signify the same by giving several short and rapid blasts, not less than four, of the steam whistle."

■■ I have found that this danger signal was given but only a few seconds before the vessels came together.

It must be conceded on the facts that the captain of the Trim noticed, when the vessels were some distance apart, the irregular course that the Exeter was following as it came down in the opposite direction. I do not believe that good navigation, or any rule, required the Trim to then reduce her speed or reverse her engine. It is to be noted that the Trim was proceeding at a very low rate of speed. She had a right to assume that the outbound vessel would obey the rules as she approached the tug.

Belden v. Chase, 150 U.S. 674, 699, 14 S.Ct. 264, 37 L.Ed. 1218.

■ The fact remains, however, that the captain of the Trim was aware of the erratic course the Exeter was following and must have perceived some time before the collision that a dangerous situation was being created by the mismanagement of the Exeter. It was his duty to take steps to avoid it, if he had time and means to do so. "The fault, and even the gross fault of one vessel, does not absolve the other from the use of such precautions as good judgment and accomplished seamanship

require." The Albert Dumois, 177 U.S. 240, 253, 20 S.Ct. 595, 600, 44 L.Ed. 751.

It is my opinion that the Trim was at fault in delaying the danger signal and the signal to reverse until too late to prevent the collision. It is impossible to say that this delay did not contribute to the disaster. The Virginian, D.C., 217 F. 604, 617; The Wydale, C.C., 37 F. 716, 718; Merchants' & Miners' Transp. Co. v. Robinson-Baxter-Dissosway Towing & Transp. Co., 1 Cir., 191 F. 769.

It has also been suggested that the Trim was at fault in failing to keep a proper lookout. If there was any omission in this respect, it was not a contributing factor because the evidence leaves no doubt that the captain of the Trim saw the lights of the Exeter and had them constantly in view until the time of the collision.

I rule, therefore, that both the Exeter and the Trim were at fault and that damages should be divided. Decrees may be entered consistent with the established doctrine of equal division of damages in Admiralty.